UNITED STATES of America,
Plaintiff-Appellee,

v.

Eddie David COX, Defendant-Appellant.

No. 71–1043.

United States Court of Appeals,
Tenth Circuit.

Oct. 13, 1971.

Rehearing Denied Nov. 23, 1971.

Craig A. Murdock, Denver, Colo., for appellant.

David H. Martin, Sp. Atty., Department of Justice, Washington, D. C., and James A. Pusateri, Asst. U. S. Atty., Kansas City, Kan. (Robert J. Roth, U. S. Atty., on the brief), for appellee.

Before PHILLIPS, HOLLOWAY and DOYLE, Circuit Judges.

WILLIAM E. DOYLE, Circuit Judge.

The defendant, Eddie David Cox, together with Maurice LaNear, Cleveland Dennis Ford and Michael DeWayne Piggie, was charged on May 28, 1970 (by indictment) with the offense of bank robbery of the Southgate State Bank of Prairie Village, Kansas, on May 8, 1970, contrary to 18 U.S.C. § 2113(a). The indictment as to Cox also invokes the aiding and abetting or accessory statute, 18 U.S.C. § 2 inasmuch as the defendant before us, Eddie David Cox, was, according to the theory of the prosecution, driving the vehicle which was used in the robbery of the bank. The defendants, Cox and LaNear, were tried together and both were convicted. The other defendants entered pleas of guilty. The present appeal is on behalf of Cox alone. Previously LaNear had been tried separately and this trial had resulted in a hung jury. At the second trial the government, in order to join LaNear with Cox, agreed to waive the introduction of a confession LaNear had made.

Previously Elmo B. Hunter, United States District Judge for the Western District of Missouri, had entered an order authorizing agents of the Bureau of Narcotics and Dangerous Drugs to intercept wire communications to and from a telephone number listed in the name of Leonard E. Richardson at 7015 Monroe, Kansas City, Missouri. The application to Judge Hunter contained a sup-

porting affidavit describing probable cause for authorizing wire investigation of violations of the Federal Narcotics Laws, 21 U.S.C. §§ 173, 174.[1]

The monitoring of these conversations started on May 1, 1970, and was continued from May 5 to and including May 8, 1970, during which latter period of time conversations were overheard and recorded by agents of the Bureau of Narcotics and Dangerous Drugs, which conversations related to the robbery of the Southgate State Bank. Thus, the conversations intercepted pertained to bank robbery, whereas the authorization was given to gain evidence with respect to narcotics.

In accordance with 18 U.S.C. § 2517 (5), application was made to the Attorney General and to Chief Judge Arthur J. Stanley, Jr., United States District Judge for the District of Kansas, for the purpose of obtaining an order authorizing the use and disclosure of the seized conversations relating to the bank robbery. Judge Stanley signed the order and some of the conversations were received in evidence at the trial.[2]

We are not told exactly when the application to Judge Stanley was made, but presumably it was a timely one since no question is raised concerning time on this appeal. Indeed, we are at liberty to presume that all of the proceedings followed were in accordance with the statute since the defendant does not find fault with any of these occurrences. He does, however, contend that § 2517 (5) is unconstitutional on its face and that it violates the Fourth Amendment to the Constitution of the United States. It is noteworthy that § 2518 imposes extensive requirements and demands on one making an application for an order authorizing or approving the interception of a wire or oral communication. Section 2518 is comprehensive and at the same time detailed in its authorization to the issuing judge to regulate interception of wire or oral communication.

The evidence on behalf of the prosecution at the trial disclosed that on May 8, 1970, the Southgate State Bank was robbed and that the robbery was carried out by three Negro males. The evidence also established that these men drove a 1961 Buick automobile to a parking lot, that of Black and Veatch Engineering Company which was located a few blocks from the bank. There, according to a

---

1. Copies of the authorizing order or the supporting affidavits and other documents do not appear as part of the record in this case. 18 U.S.C. § 2518(4) provides:

> (4) Each order authorizing or approving the interception of any wire or oral communication shall specify—
>
> (a) the identity of the person, if known, whose communications are to be intercepted;
>
> (b) the nature and location of the communications facilities as to which, or the place where, authority to intercept is granted;
>
> (c) particular description of the type of communication sought to be intercepted, and a statement of the particular offense to which it relates;
>
> (d) the identity of the agency authorized to intercept the communications, and the person authorizing the application; and
>
> (e) the period of time during which such interception is authorized, including a statement as to whether or not the interception shall automatical-

ly terminate when the described communication has been first obtained.

2. Section 2517(5) is the statute pursuant to which the order was signed. It provides as follows:

> (5) When an investigative or law enforcement officer, while engaged in intercepting wire or oral communications in the manner authorized herein, intercepts wire or oral communications relating to offenses other than those specified in the order of authorization or approval, the contents thereof, and evidence derived therefrom, may be disclosed or used as provided in subsections (1) and (2) of this section. Such contents and any evidence derived therefrom may be used under subsection (3) of this section when authorized or approved by a judge of competent jurisdiction where such judge finds on subsequent application that the contents were otherwise intercepted in accordance with the provisions of this chapter. Such application shall be made as soon as practicable.

police officer following the Buick, this automobile was abandoned. The occupants proceeded east from the car through some shrubs to another parking lot. An employee of Black and Veatch testified that he had seen a 1969 light tan or white Plymouth four-door sedan which had a large dent in the left front fender. This car was driven by a white individual and was parked in the lot of Black and Veatch. Another witness saw three Negro males running across the Black and Veatch parking lot to a parked car which appeared to be a 1969 white Plymouth. According to the witness, the three men stopped at the rear of this car and he overheard garbled conversations, including the words "Here," or "In here." This man retreated into his garage and his next observation was that the automobile was being driven out of the parking lot by a single male occupant.

An FBI agent observed that the defendant Cox owned a white 1969 Plymouth four-door sedan which had a noticeable dent between the left front headlight and wheel well of that car.

Several tape recordings of intercepted telephone conversations were introduced. One such conversation (Exhibit 31) between Michael Piggie and Maurice LaNear involved a discussion of plans for the proposed bank robbery. In this conversation LaNear inquired as to who would be driving and Piggie responded: "Ah, Eddie." LaNear responded "Eddie who?" Piggie replied "You know, the fella, the white fella." In another conversation LaNear informed Piggie that he did not "even trust that white dude and I don't even know him." (Exhibit 26). In a conversation which was recorded on the day of the robbery Michael Piggie asked Eugene Richardson, in whose name the tapped telephone was listed, to "call Eddie for me and tell that, tell him I said it was ready." Richardson proceeded to call Eddie Cox. In this very crucial conversation, crucial because it definitely established that Eddie was Eddie Cox, the

defendant herein, since the telephone number called was shown to have been his, appears the following:

"O.K. but, uh, Mike just called and told me to tell you he's ready for you, give you call."

EDDIE: "Who? Mike?"

GENE: "Yeah."

EDDIE: "O.K., then, I'll stop by there tonight."

GENE: "O.K."

In a conversation recorded the evening of the day of the robbery, it developed that Eddie had furnished LaNear with Piggie's telephone number and on the evening following the robbery there was a conversation between Piggie and Cox in which the robbery was discussed as if Cox knew all about it.

Thus, recordings were introduced, which although somewhat vague, served to identify Cox with the robbery both before and after it occurred.

The defendant seeks reversal on several grounds. Primarily, he challenges the use in evidence of certain intercepted telephone conversations. His basis is that 18 U.S.C. § 2517(5) is unconstitutional in that it allows use of intercepted telephone communications where the wire tapping has not been previously authorized by a judge. He maintains that the post audit provision of this section by a judge does not satisfy the requirements of the Fourth Amendment.

Secondary contentions or assignments include:

1. The alleged error of the trial court in refusing to grant a severance from his codefendant, Maurice LaNear, on the basis that statements in conversations between the codefendants which were incriminating as to Cox, but with respect to which he was not a participant, were received.

2. The lack of knowledge on the part of the agents monitoring the recordings which could have allowed them to identify the voices or to match the telephone numbers called.

3. The refusal of the court to omit portions of Exhibit 26 containing, so it is argued, incriminating hearsay statements inculpating the defendant Cox.

4. The statement of the U. S. Attorney suggesting that LaNear's confession implicated others, thus creating an impression that the confession which was not received in evidence implicated the defendant Cox.

5. The alleged insufficiency of the evidence to present a prima facie case as to the defendant Cox.

## I.

Title III of the Omnibus Crime Control and Safe Streets Act of 1968 [3] represents the first comprehensive federal legislation in the area of wiretapping and electronic surveillance. It supersedes section 605 of the Federal Communications Act of 1934.[4] Its dual purpose is "(1) protecting the privacy of wire and oral communications, and (2) delineating on a uniform basis the circumstances and conditions under which the interception of wire and oral communications may be authorized." [5]

Prior to the enactment a Presidential Commission found that organized criminals use wire and oral communications and recommended that such communications were essential to effective detection and prosecution.[6] The report of the President's Commission was an important impetus in the passage by the Congress of the Omnibus Crime Control and Safe Streets Act, including the mentioned Title III which included provisions for law enforcement officers intercepting telephone communications after having obtained judicial authorization. Congress in passing the Act considered carefully the decisions of the Supreme Court in Berger v. New York, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967); Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); and Osborn v. United States, 385 U.S. 323, 87 S.Ct. 429, 17 L.Ed.2d 394 (1966), and made an intensive effort to comply with the standards which had been enunciated in these cases.[7] Notwithstanding the care taken, the Congress

3. 18 U.S.C. §§ 2510–20.

4. 48 Stat. 1103 (1934), as amended, 47 U.S.C. § 605. For discussions of the cases decided under section 605 and the Fourth Amendment, see Note, Wiretapping and Electronic Surveillance—Title II of the Crime Control Act of 1968, 23 Rutgers L.Rev. 319 n. 3 (1969); S.Rep.No. 1097, 90th Cong., 2d Sess., 1968 U.S.Code Cong. & Ad.News, pp. 2112, 2153 (1968).

5. S.Rep.No.1097, 90th Cong., 2d Sess., 1968 U.S.Code Cong. and Ad.News, pp. 2112, 2153 (1968).

6. President's Commission on Law Enforcement and Administration of Justice, 1967. At about the same time the Supreme Court decided Berger v. New York, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967) and Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

7. See Senate Report 1097, 90th Cong., 2 U.S.Code Cong. & Ad.News, p. 2153. Referring to the *Berger* case the Committee report declared at pages 2161, 2162:
    During the course of the majority opinion the Court delineated the following constitutional standards the New York statute failed to meet:
    (1) Particularity in describing the place to be searched and the person or thing to be seized.
    (2) Particularity in describing the crime that has been, is being, or is about to be committed.
    (3) Particularity in describing the type of conversation sought.
    (4) Limitations on the officer executing the eavesdrop order which would (a) prevent his searching unauthorized areas, and (b) prevent further searching once the property sought is found.
    (5) Probable cause in seeking to renew the eavesdrop order.
    (6) Dispatch in executing the eavesdrop order.
    (7) Requirement that the executing officer make a return on the eavesdrop order showing what was seized.
    (8) A showing of exigent circumstances in order to overcome the defect of not giving prior notice.

has incurred extensive criticisms of Title III of the Act by various commentators.[8]

Title III imposes an overall ban on the interception and disclosure of wire or oral communications, but it authorizes interception in connection with the investigation of particular serious crimes by either federal law enforcement officers or state officers acting pursuant to state statute. In most instances the officer is required to obtain a court order before the interception begins. Such an order can be issued only after a judge of competent jurisdiction has determined that specific grounds exist which justify the use of the intercepting devices. When the objective is attained the wiretapping must cease, and there is an overall 30 day limitation which may be extended for an additional 30 days should the judge make new findings sufficient to uphold an original authorization. Information obtained as a result of authorized surveillance may be used or disclosed by the officer to the extent appropriate to the proper performance of his duties and while giving testimony under oath or affirmation in any proceeding held under the authority of the United States or any state or political subdivision thereof. Subsection (5) of 18 U.S.C. § 2517 allows interception and use of information relating to offenses other than those specified in the order of authorization, but it must be approved by a judge based on finding that the contents were intercepted in accordance with the law. If the officers have not complied with the strict requirements of the statute, the contents of the communication or evidence which stems from it can be suppressed and the person making the interception is subject both to criminal and civil liability. In sum, Title III sets up a system of strict judicial supervision which imposes tight limitations on the scope of the investigation.

The conversations intercepted in the case at bar were outside the express limits of the original authorization. These conversations were, however, intercepted in the course of an authorized investigation and thus they fall within the provisions of 18 U.S.C. § 2517(5). It is this aspect of the statute which counsel for Cox maintains is unconstitutional because of its lack of requirement for specific prior authorization. He argues that this part of the statute is out of harmony with the express terms of the Fourth Amendment and that it is not in compliance with the letter and spirit of Berger v. New York, *supra*.

Involved in *Berger* was a New York statute which authorized any justice of the Supreme Court or judge of county court of New York County to issue ex parte orders for eavesdropping upon oath or affirmation of an officer (district attorney, attorney general or officer above the rank of sergeant) that there existed reasonable ground to believe that evidence of crime would be thus obtained. The statute did not require evidence that a specific crime had been committed nor did it demand a specific showing as to conversations sought nor of exigent circumstances. The Supreme Court held that this broad and sweeping character of the statute rendered it unconstitutional on its face. Writing for the Court Mr. Justice Clark condemned its failure to require presentation and evaluation of the specific circumstances rendering the surveillance or eavesdropping necessary. The two-month surveillance period was considered too long a time, thus allowing a series of intrusions, searches and seizures pursuant to a single showing of probable cause. It was characterized as

8. Linzer, Federal Procedure for Court Ordered Electronic Surveillance: Does it Meet the Standards of Berger and Katz? 60 J.Crim.L.C. & P.S. 203 (1969); Spritzer, Electronic Surveillance by Leave of the Magistrate: The Case in Opposition, 118 U.Pa.L.Rev. 169 (1969); Schwartz, The Legitimation of Electronic Eavesdropping: The Politics of "Law and Order," 67 Mich.L.Rev. 455 (1969); Note, Wiretapping and Electronic Surveillance—Title III of the Crime Control Act of 1968, 23 Rutgers L.Rev. 319 (1969); Note, 3 Valparaiso U.L.Rev. 89 (1968) (specifically suggesting that § 2517(5) of Title III may be unconstitutional).

granting a "roving commission" or "general warrant" to seize any and all conversations. The basic right violated by unregulated eavesdropping was held to be the individual's right to privacy. Such intrusion was said to have been prohibited long before the adoption of the Fourth Amendment.[9]

In any event we cannot forgive the requirements of the Fourth Amendment in the name of law enforcement. This is no formality that we require today but a fundamental rule that has long been recognized as basic to the privacy of every home in America. While "[t]he requirements of the Fourth Amendment are not inflexible, or obtusely unyielding to the legitimate needs of law enforcement," Lopez v. United States, supra [373 U.S. 427], at 464, 83 S.Ct. [1381] at 1404, [10 L.Ed.2d 462] (dissenting opinion of Brennan, J.), it is not asking too much that officers be required to comply with the basic command of the Fourth Amendment before the innermost secrets of one's home or office are invaded. Few threats to liberty exist which are greater than that posed by the use of eavesdropping devices. Some may claim that without the use of such devices crime detection in certain areas may suffer some delays since eavesdropping is quicker, easier, and more certain. However, techniques and practices may well be developed that will operate just as speedily and certainly and—what is more important—without attending illegality. 388 U.S. at 62–63, 87 S.Ct. at 1885.

The Court laid down the essential requirements in any statute or rule authorizing eavesdropping. Congress sought to include these standards in drafting Title III.

In Katz v. United States, supra, decided a few months following the Berger decision, an F.B.I. agent attached an electronic listening device to the outside of a telephone booth and intercepted wagering information. The central issue was whether a telephone booth was entitled to Fourth Amendment protection. The Court made it clear that it was; that the conversation was entitled to constitutional protection rather than the particular place from which it emanated. Olmstead v. United States, 277 U.S. 438, 475–476, 48 S.Ct. 564, 72 L.Ed. 944 (1928), and Goldman v. United States, 316 U.S. 129 (1942), which had stressed trespass in the physical sense as the essential invasion were overruled. Finally, it was held that the failure to obtain any prior authorization rendered the interception invalid; that a phone booth exception was not justified.

Osborn v. United States, supra, which was considered and commented on at length by the Court in Berger, and which was regarded as a model in Fourth Amendment compliance, had to do with authorization in respect to a specific individual and to a particular offense. A background case in Osborn was a publicized one (Hoffa) and it was the extreme care that was taken in the granting of authority and the limiting and circumscribing of the investigation itself which led the Court to uphold the recording and use of the conversation.

The effect then of these recent rulings of the Supreme Court has been to limit and restrict the scope of wiretapping or eavesdropping by requiring that it be carried out under the strictest judicial supervision. Specific prior authorization seems to be prescribed, although the Court has not passed on the issue that we have here involving as it does subsequent judicial scrutiny of unanticipated material obtained incident to a warrant describing other subject matter. Whether the Court will regard this as a compliance with the Fourth Amendment as construed in Berger, Katz and Osborn remains uncertain.

9. See the famous case of Entick v. Carrington, 19 How.St.Tr. 1029, 1066 (1765). Blackstone's Commentaries Defining Eavesdropping. See, also, Boyd v. United States, 116 U.S. 616, 626, 627, 6 S.Ct. 524, 29 L.Ed. 746 (1886).

The government's further argument is that § 2517(5) can be upheld based on the "plain view" analogy applicable to the seizing of tangible evidence and instruments of crime. This is, of course, an exception to the requirement that an object seized must be particularly described in the application for a warrant. Inasmuch as warrants for interception of electronic information generally follow the principles applicable to search warrants, it is said that just as evidence not described but which is discovered by the officers in the course of a valid search is under certain circumstances admissible, so also intercepted conversations should be similarly treated.[10]

One difficulty in this is that the law on this plain view subject is not fully developed and also remains unclear. For example, in Marron v. United States, 275 U.S. 192, 48 S.Ct. 74, 72 L.Ed. 231 (1927),[11] it was held that a search warrant must be executed strictly in accordance with its terms, leaving nothing to the discretion of the officer. It is argued that Harris v. United States,

331 U.S. 145, 155, 67 S.Ct. 1098, 91 L.Ed. 1399 (1945), modifies the *Marron* doctrine and that lower federal courts have considered *Harris* fully applicable to search warrant cases even though it had to do with seizure incident to arrest.[12]

Discussion in Coolidge v. New Hampshire recently decided, June 21, 1971, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564, succeeds in clarifying the "plain view" doctrine. But the analogy is imperfect because the search for property is a different and less traumatic invasion than is the quest for private conversations.

The reason then for the seriousness of the problem here arises not from the fact that the particular conversations were not specifically described and given specific prior authorization, but rather from the unmanageability generally of electronic surveillance. The area is peculiarly sensitive due to its effort to probe the thoughts of the man who is the object of the search.[13] Once the

---

10. Two Judges of the United States District Court for the Southern District of Florida have held that the plain view doctrine applies to electronic searches under Title III and hence that § 2517(5) thereof is constitutionally valid. United States v. Sklaroff, 323 F.Supp. 296, 307 (S.D.Fla.1971) (Cabot, J.); United States v. Escandar, 319 F.Supp. 295, 300–301 (S.D.Fla.1970) (Mehrtens, J.). In the Sklaroff case, Judge Cabot wrote:

> It is settled law in search and seizure cases that certain items not named in the search warrant may be seized if discovered in the course of a lawful search. (Citations omitted.) By analogy, the same rule should apply to conversations, which are "seizures" under the *Katz* case. 18 U.S.C. § 2517 provides that, when approved by a judge of competent jurisdiction, intercepted conversations relating to other crimes may be used as evidence or divulged, provided the original interception itself was authorized by a lawful court order. This is only a restatement of existing case law, adapted to fit the electronic surveillance situation.

11. Which has never been overruled.

12. See Aron v. United States, 382 F.2d 965 (8th Cir. 1967), and United States v. Eisner, 297 F.2d 595 (6th Cir. 1962), wherein the *Harris* doctrine has been applied to searches pursuant to warrant.

13. In an ancient Year Book case, Chief Justice Bryan said: "The thought of man shall not be tried," "for the devil himself knoweth not the thought of man." Y.B. 7 Edw. IV, f. 2, pl. 2.

Congress was aware of the sensitiveness of the area of search. It said:

> The tremendous scientific and technological developments that have taken place in the last century have made possible today the widespread use and abuse of electronic surveillance techniques. As a result of these developments, privacy of communication is seriously jeopardized by these techniques of surveillance. Commercial and employer-labor espionage is becoming widespread. It is becoming increasingly difficult to conduct business meetings in private. Trade secrets are betrayed. Labor and management plans are revealed. No longer is it possible, in short, for each man to retreat into his home and be left alone. Every spoken word relating to each man's personal, marital, reli-

listening commences it becomes impossible to turn it off when a subject other than one which is authorized is overheard. It would be the height of unreasonableness to distinguish between information specifically authorized and that which is unanticipated and which develops in the course of an authorized search such as that involved here. It would be irrational to hold that officers authorized to listen to conversations about drug traffic, upon learning that a bank robbery is to occur, must at once close down the project and not use the information to prevent the robbery since the information is tainted. It would be demoralizing to allow the bank to be robbed while the investigators stood by helpless to prevent the occurrence. Harder cases can be imagined. For example, in electronic surveillance of organized criminals involved in gambling, information might be intercepted disclosing a conspiracy to commit murder. Surely the officials must be empowered to use this information notwithstanding the lack of specific prior authorization.

As we view it, Congress was seeking to deal realistically with highly complex problems in accordance with the demands of the Constitution. We are unable to say that the product fails to satisfy the Constitution. Every effort has been made to comply with the requirements of *Berger* and *Katz*. Section 2518(4) of Title III is as precise and discriminate in its approach as are the demands of *Berger* and *Katz*. It requires (see Note 1, *supra*) that each order identify the person whose communications are being intercepted, describe the nature and location of the communications facilities or the place where authority is granted, particularly describe the type of communication sought to be intercepted and a statement of the particular offense to which it relates, identity of the agency authorizing the application, and finally the period of time during which the interception is authorized, including a statement as to whether the interception shall automatically terminate when the communication has been first obtained. Thus, the statute calls for the most careful scrutiny of the application and for specific findings and restrictions by the judge to whom the application is presented.

We must presume that an authorization order drafted in accordance with this section will impose strict limitations on the officer who is to execute the authorization. We cannot presume that it will grant a roving commission or general warrant to seize any and all conversations coming into the area covered by the device. A judge will surely scrutinize any application and will scrupulously impose the restrictions required by the statute and by the decisions.[14]

In summary then, we uphold the statute on the basis that it demands an original authorization in accordance with the mandate of Berger v. New York, *supra*, and we do so upon the basis that the nature and probable consequence of authorized wiretapping is discovery of unanticipated and undescribed communications. The very nature of this form of invasion is conducive to producing unexpected information. If wiretapping is to be validated, and *Berger, Osborn* and *Katz* recognize its validity, then the interception and use of information which is so related to the original search is not to be excluded. In other words, Congress has dealt with the problem about as well as could have been expected considering the nature and character of the subject matter and its consequential incidents. The defendant's contention is rejected.

gious, political, or commercial concerns can be intercepted by an unseen auditor and turned against the speaker to the auditor's advantage. S.Rep.No.1097, 90th Cong., 2d Sess., 1968 U.S.Code Cong. & Ad.News, pp. 2112, 2154 (1968).

14. In tailoring an authorization the judge might well require, for example, early and frequent reports in writing by the officer as to the nature and character of the interceptions, whereby further specific orders could be imposed.

## II.

### THE SEVERANCE QUESTION ARISING FROM EVIDENCE OF THE INTERCEPTED CONVERSATION

■ Defendant contends that he was entitled to have a separate trial from that of his codefendant, Maurice La-Near, because of the reception into evidence of intercepted statements made to LaNear by Michael Piggie which related to him. He relies on Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). Defendant's argument is that since Michael Piggie refused to testify when he was called to the stand, he (Cox) was deprived of his right to cross-examine Piggie in violation of his Sixth Amendment right to confront the witnesses against him. We must disagree. The telephone conversations (which have been described above) occurred prior to the bank robbery, and once a conspiracy was established were admissible as a well recognized exception to the hearsay rule.[15]

Contrary to the contention of the defendant, there was substantial independent evidence to establish a conspiracy. We have in mind:

1. The interception of the telephone call to the defendant Cox's telephone number which the agents were able to positively establish from counting the clicks in connection with the dialing.

2. Evidence of the use of an automobile in the robbery which exactly answers the description of the vehicle which was owned by the defendant.

3. There was independent evidence that a white man was driving in accordance with the conversations.

4. The admissions of defendant which came through on Exhibit 33.

■ An additional objection goes to the court's receiving Exhibit 32, a tape recording of a conversation between La-Near and Piggie just prior to the conversation mentioned in Exhibit 33 between Piggie and the defendant which is discussed immediately above. In the course of this there were statements made by each of the participants inculpatory as to them, and there was a reference to the defendant to the effect that he had furnished LaNear with Piggie's telephone number. This conversation occurred at 7:45 p.m. on the night following the robbery and, therefore, so it is argued, the active conspiracy was terminated. Nevertheless, it was so closely related to the activities of the day and to the fruits of the crime as to be regarded as part of the incident itself or the res gestae. A similar problem was considered by this court in Mares v. United States, 383 F.2d 805 (10th Cir. 1967), cert. denied, 394 U.S. 963, 89 S.Ct. 1314, 22 L.Ed.2d 564. We there held that the condition presented was to be distinguished from that which obtained in Krulewitch v. United States, 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790 (1949).

Here also the conversation between LaNear and Piggie occurred very soon after the robbery and immediately after the conversation between defendant and Piggie. Both conversations were intimately related to the offense and are to be regarded as inseparable parts of the robbery transaction. Thus, the receiving of the conversation between LaNear and Piggie established prima facie a conspiracy in which Cox was a participant. The government was not guilty of boot strapping.

■ Evidence which is admissible under the conspiracy exception to the hearsay rule does not violate the right to confront and cross-examine guaran-

---

15. *Cf.* Krulewitch v. United States, 336 U.S. 440, 443–455, 69 S.Ct. 716, 93 L.Ed. 790 (1949) and Wong Sun v. United States, 371 U.S. 471, 490, 83 S.Ct. 407,

9 L.Ed.2d 441 (1963). *See also* the extensive Note, Developments in the Law of Conspiracy, 72 Harv.L.Rev. 920, 983–986 (1959).

teed by the Sixth Amendment.[16] The *Bruton* doctrine does not rule situations like the present one in which the evidence is admissible under a well recognized exception to the hearsay rule. In Bruton v. United States, 391 U.S. 123, 128 n. 3, 88 S.Ct. 1620, 1623, 20 L.Ed.2d 476 (1968), it was said:

> We emphasize that the hearsay statement inculpating petitioner was clearly inadmissible against him under traditional rules of evidence * * *. There is not before us, therefore, any recognized exception to the hearsay rule insofar as petitioner is concerned and we intimate no view whatever that such exceptions necessarily raise question under the Confrontation Clause.[17]

Based on the distinction between inadmissible hearsay and that which falls within a well recognized exception, we hold that the defendant's confrontation right was not violated by the receiving of the conversations complained of.

■ Defendant further argues that the conversation between LaNear and defendant which occurred the day following the robbery was inadmissible because the conspiracy had then terminated. The crucial factor here, however, is that the conversation was with the defendant and it was admissible as a non-custodial admission made so soon after the criminal transaction as to be regarded as a part of it. Thus, the conspiracy exception is not here involved. This is merely a conversation between the defendant and a codefendant from which incriminatory inferential admissions arise. The argument of the government that LaNear took the stand and testified in his own behalf and was thus subject to cross-examination whereby the prejudice, if any, was cured need not be considered.

III.

SUFFICIENCY OF KNOWLEDGE OF THE MONITORING OFFICERS TO IDENTITY VOICES AND TO MATCH THE TELEPHONE NUMBERS CALLED

Defendant maintains that certain voice identification testimony of the monitoring agents was improperly received into evidence because, so he claims, the agents did not have the requisite knowledge to identify the voices.[18]

■ Defendant first contends that with respect to the tape recording labeled (Plaintiff's) Exhibit 23, "[t]he witness Hanson stated that he recognized the voice as 'Maurice' because he had heard it before * * *." However, an examination of the record on this point reveals that witness Hanson never did identify a voice on Exhibit 23 as belonging to Maurice. As counsel for defendant Cox stated in objecting to the admission of Exhibit 23:

> Mr. Hanson has admitted quite candidly that there is no way in the world that he can identify the voice which is labeled Maurice. He didn't identify the voice at all. All it is is simply some man on that phone said "This is Maurice" or someone else said, "Is this Maurice?"

Exhibit 23 was properly admitted into evidence over this objection based on the circumstantial evidence that the voice alleged to belong to Maurice LaNear identified itself as "Maurice" and the telephone number called belonged to the residence of Maurice LaNear. Palos v. United States, 416 F.2d 438 (5th Cir.) cert. denied, 397 U.S. 980, 90 S.Ct. 1107, 25 L.Ed.2d 391 (1969); Grogan v. United States, 394 F.2d 287 (5th Cir.) cert. denied, 393 U.S. 830, 89 S.Ct. 97, 21

---

16. Campbell v. United States, 415 F.2d 356 (6th Cir. 1969); Howell v. United States, 300 F.Supp. 1017 (N.D.Ill.1969). *Compare* Evans v. Dutton, 400 F.2d 826 (5th Cir. 1968).

17. *See also* Matthews v. United States, 217 F.2d 409, 418 (5th Cir. 1954).

18. Defendant-appellant explicitly does not argue that the prosecution failed to make out a prima facie case on the question of identity sufficient for submission of the question to the jury.

L.Ed.2d 100 (1967); United States v. Stein, 327 F.2d 657 (2d Cir. 1964).

Defendant also objects to voice identification with respect to Exhibit 31 because the identification was based on subsequently acquired familiarity with the voice of Maurice LaNear, which familiarity was gained from listening to subsequently intercepted conversations in which Maurice LaNear was alleged to have participated. It is said that witness Kreidel did not have first hand knowledge of the voice of Maurice La-Near.

■ It is clear, however, that the requirement that a witness have some basis for comparing a voice with that of a particular person is generally satisfied if the witness acquires his knowledge of the person's voice after the event testified to by the witness. *See* United States v. Moia, 251 F.2d 255, 257 (2d Cir. 1958); 29 Am.Jur.2d § 368, p. 417.

■ We are of the opinion also that the witness' knowledge of Maurice La-Near's voice would be sufficient for a voice identification, if the tapes from which the witness gained his knowledge were otherwise sufficiently supported by evidence establishing that Maurice La-Near participated in those *other* conversations. Viewing the record as a whole, it appears that there was sufficient circumstantial evidence to establish Maurice LaNear's identity in the other recorded conversations. See, for example, the discussion with respect to Exhibit 23, *supra*.

For these reasons we hold that the witnesses did have requisite knowledge to identify Maurice LaNear's voice on Exhibits 23 and 31.

## IV.

## THE STATEMENT OF GOVERNMENT COUNSEL SUGGESTING THAT LaNEAR'S CONFESSION IMPLICATED OTHERS

In order to obtain joinder of defendants Cox and LaNear, the government agreed not to introduce LaNear's confession into evidence at the joint trial and all reference thereto was avoided during the trial—with one possible exception. On cross-examination of the F.B.I. agent who had arrested LaNear, where direct examination had brought out the fact that LaNear had made a statement but had not touched upon the contents of the statement, counsel for the United States stated the following:

Q Then do most people who you take confessions from implicating someone else, are they nervous? (Tr. 664.)

Objection to this was promptly sustained. Defendant contends that this statement, being unrelated to the previous direct examination of the witness, was highly prejudicial inasmuch as it suggested to the jury that LaNear had made a confession implicating Cox.

■ This contention is without merit. LaNear had taken the stand and had testified as to the role that each of the four initial defendants had played in the robbery (Piggie, Ford, Cox and La-Near). LaNear also testified that he had made a statement to the arresting officer containing the same substance as his in-court testimony. Under these circumstances, the challenged statement of counsel did not constitute ground for declaring a mistrial.

## V.

## SUFFICIENCY OF THE EVIDENCE

The case was largely based upon circumstantial evidence. However, in view of our summary of the testimony and comments on it appearing above, we deem it unnecessary to consider further the question of legal sufficiency. We perceive no error in the denial by the court of the motion for judgment of acquittal.

The judgment is affirmed.