UNITED STATES of America
v.
Michael FOCARILE et al.

UNITED STATES of America
v.
Dominic Nicholas GIORDANO.

UNITED STATES of America
v.
Dominic Nicholas GIORDANO
and
Michael Focarile.
Crim. Nos. 70-0483-M, 70-0486-M and 70-0487-M.

United States District Court,
D. Maryland.
Feb. 22, 1972.

George Beall, U. S. Atty., and Francis S. Brocato, Asst. U. S. Atty., Baltimore, Md., for plaintiff.

Aaron R. Schacher, Brooklyn, N. Y., for defendant Focarile.

H. Russell Smouse, Baltimore, Md., for defendant Giordano.

Frank V. Seglinski, Baltimore, Md., for defendant D'Anna.

Howard L. Cardin, Baltimore, Md., for defendants Wallace, Baldwin, and Silverstein.

Arthur G. Murphy, Sr., Baltimore, Md., for defendants Pettiford and Harris.

Jerome Blum, Baltimore, Md., for defendant Blackwell.

John A. Shorter, Jr., Washington, D. C., for defendant Williams.

Stephen H. Sachs, Baltimore, Md., for defendant Pope.

Donald Daneman, Baltimore, Md., for defendant Dorsey.

Alan H. Murrell and Phillip M. Sutley, Baltimore, Md., for defendant Davis.

Leonard S. Freedman and Stanley J. Shapiro, Baltimore, Md., for defendant Jones.

JAMES R. MILLER, Jr., District Judge.

## OPINION

Motions to suppress the contents of intercepted telephone communications and evidence derived therefrom have been filed in three related cases. The telephone involved in all the motions was located in the apartment of Dominic Nicholas Giordano in Baltimore. For the purpose of ruling on the motions to suppress, the three cases shall be treated as one.

The wiretap involved was conducted by agents of the Bureau of Narcotics and Dangerous Drugs (BNDD), pursuant to an order issued on October 16, 1970, and an extension order issued on November 6, 1970, both by Chief Judge Northrop of this court (Misc. No. 739–N). On October 8, 1970, Chief Judge Northrop had signed an order (Misc. No. 737–N) authorizing agents of the BNDD to utilize a device euphemistically known as a "pen register" to record the telephone numbers called from a telephone subscribed by a person subsequently identified as Dominic Nicholas Giordano. The pen register order was also extended by subsequent orders of Chief Judge Northrop, dated October 22, 1970, and November 6, 1970.

The motions raise serious questions relating to the constitutionality, scope, and meaning of Title III of the Omnibus Crime Control and Safe Streets Act of 1968. Pub.L. 90–351, Title III, § 802, June 19, 1968, 82 Stat. 112–223; 18 U.S. C. §§ 2510–2520. Due primarily to a lack of precedent in this circuit on most of the points raised in the motions, the court attempted to act cautiously in guiding the hearings which were conducted at great length. Both the defendants and the government were allowed great latitude in their attempts to sustain their respective factual and legal positions. As will become apparent from this opinion, this court believes that future hearings on motions to suppress filed in other wiretap cases can be substantially

shortened and should be conducted generally in the same manner as hearings on search warrants and similar questions.

In the course of this opinion the points raised by the motions will be discussed. The factual background necessary for the resolution of the respective issues presented will be set forth in the respective sections of this opinion pertaining to the pertinent issue.

I

*The Constitutionality of Title III*

■ Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510 et seq., is an attempt by Congress to ". . . prohibit[s] all wiretapping and electronic surveillance by persons other than duly authorized law enforcement officials engaged in the investigation of specified types of major crimes after obtaining a court order . . ." and by certain other strictly limited classes of persons. 1968 U.S. Code Cong. & Admin.News, p. 2113. In the legislation Congress reaffirmed the Fourth Amendment requirement of prior judicial authorization for electronic surveillance and attempted to comply with the standards enunciated in Berger v. New York, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967) and Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). *Ibid.* The defendants contend that the statute violates the prohibitions of the Fourth Amendment against unreasonable search and seizure.

It is elementary constitutional law that the Fourth Amendment does not prohibit all searches and seizures but only those that are unreasonable. Carroll v. United States, 267 U.S. 132, 147, 45 S.Ct. 280, 69 L.Ed. 543 (1925). Historically, the amendment was conceived with the idea of protecting the individual against the "general warrant" and safeguarding his privacy and security against arbitrary invasions by governmental officials. Camara v. Municipal Court, 387 U.S. 523, 528, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967). The determina-tion of the constitutionality of Title III —and particularly 18 U.S.C. § 2518— therefore rests on the question whether it "is so broad as to result in the authorization for a general warrant permitting an unreasonable search and seizure in violation of the 4th Amendment." United States v. Scott, 331 F.Supp. 233 (D.D.C.1971).

The standards for testing the constitutionality of a statute authorizing electronic surveillance have been promulgated by the United States Supreme Court in Berger v. New York, *supra*; Katz v. United States, *supra*; and Osborn v. United States, 385 U.S. 323, 87 S.Ct. 429, 17 L.Ed.2d 394 (1966). Although the Supreme Court has not as yet ruled specifically on the constitutionality of Title III, this issue has been raised before other federal tribunals. Thus far, Title III has successfully run the constitutional gauntlet imposed by *Berger, Katz,* and *Osborn.* United States v. Cox, 449 F.2d 679 (10th Cir. 1971); United States v. King, 335 F.Supp. 523 (S.D. Cal.1971); United States v. Perillo, 333 F.Supp. 914 (D.Del.1971); United States v. Leta, 332 F.Supp. 1357 (M.D. Pa.1971); United States v. Scott, *supra*; United States v. Cantor, 328 F. Supp. 561 (E.D.Pa.1971); United States v. Sklaroff, 323 F.Supp. 296 (S.D.Fla. 1971); United States v. Escandar, 319 F.Supp. 295 (S.D.Fla.1970), reversed on other grounds sub nom. United States v. Robinson, 40 L.W. 2454 (5th Cir., Jan. 12, 1972).

Judge Nielsen in United States v. King, *supra*, at p. 532, correctly and succinctly characterized the strict limitations upon electronic searches imposed by Title III when he said:

". . . It is not in dispute that general, exploratory electronic searches are not permissible under the Fourth Amendment, but Section 2518 appears to have been drawn with the specific purpose of eliminating such a possibility in the narrowly circumscribed system it creates. Under Section 2518 a wiretap may be effected only when a federal judge determines

there is probable cause to believe a specific offense has been, is being, or will be committed, and that telephonic communications will reveal pertinent information. There are other precautionary measures; among the most important: the communications to be intercepted must be specifically described; normal investigative procedures must be shown to be inadequate or inappropriate; the duration of the wiretap must be strictly limited; efforts must be made to minimize the interceptions which do not relate to the subject matter of the investigation; and frequent progress reports must be made to the authorizing judge. . . ."

This court concurs with the other courts cited above which have found that Title III, and particularly section 2518, complies with the constitutional requirements of the Fourth Amendment. The reasons for this conclusion are set forth at length in these cases.

## II

### The Pen Register

The order of Chief Judge Northrop of October 8, 1970, in Misc. No. 737–N, authorized BNDD agents to "attach a device which will register the telephone numbers called from the telephone subscribed to by Nicholas Giordina and carrying number 685–0211." The authorization was to terminate fourteen (14) days from the date of the order and progress reports were to be made to the court on the 5th and 10th days following

the order. On October 22, 1970, and on November 6, 1970, extensions were granted for the continued use of a telephone registering device on the telephone subscribed to by Dominic Nicholas Giordano (it had been learned by BNDD in the interim that the subscriber's real name was "Giordano" and not "Giordina") and carrying the new number 685–2332. Termination dates and dates for progress reports were also established for these extensions.

Defendants have attacked these orders for the use of a pen register [1] device on two fronts: (1) the requirements for the interception of oral and wire communications as set forth in Title III were not met and (2) there was no sufficient showing of probable cause to warrant the judge granting the "pen register" order.

The determination of the validity of the first contention of the defendants requires the court to make the threshold determination as to whether the recording of numbers with a pen register or similar device is an "interception" within the meaning of 18 U.S.C. § 2510(4), thus making compliance with the procedures set forth in §§ 2516 and 2518 a prerequisite to the installation and use of such devices. Although there are a number of cases [2] which have held that the use of a pen register to record calls is an interception of a communication within the meaning of the Communications Act of 1934 (47 U.S.C. § 605), the predecessor to Title III, this court is of the opinion that the use of a pen register or similar device is not an "in-

---

1. The following definition of a "pen register" is found in United States v. Caplan, 255 F.Supp. 805, 807 (E.D.Mich.1966);

 "The pen register is a device attached to a given telephone line usually at a central telephone office. A pulsation of the dial on the line to which the pen register is attached records on a paper tape dashes equal in number to the number dialed. The paper tape then becomes a permanent and complete record of outgoing numbers called on the particular line. With reference to incoming calls, the pen register records only a dash for each ring of the telephone but does not

 identify the number from which the incoming call originated. The pen register cuts off after the number is dialed on outgoing calls and after the ringing is concluded on incoming calls without determining whether the call is completed or the receiver is answered. There is neither recording nor monitoring of the conversation."

2. United States v. Dote, 371 F.2d 176 (7th Cir. 1966); United States v. Caplan, supra; cf. United States v. Covello, 410 F.2d 536 (2d Cir. 1969).

terception" within the meaning of section 2510(4) of Title III therefore making compliance with Title III unnecessary. *Accord* United States v. King, *supra*; United States v. Vega, 52 F.R.D. 503 (E.D.N.Y.1971); United States v. Escandar, *supra,* reversed on other grounds sub nom. United States v. Robinson, *supra.*

The term "intercept" is defined under 18 U.S.C. § 2510(4) as "the *aural* acquisition of the contents of any wire or oral communication through the use of any electronic, mechanical, or other device." (emphasis added). Webster's Third New International Dictionary has defined the word "aural," *inter alia,* as "of or relating to the sense of hearing." The evidence in this case clearly indicates that not only did Congress intend that pen register devices be excluded from the requirements of Title III, but also that pen register devices when used as decoders only do not involve the "aural acquisition of the contents of any wire or oral communication."

The legislative history of Title III discloses unequivocally that Congress did not contemplate that the use of pen register devices would fall within the ambit of the Act. The Senate Committee on the Judiciary's Report on The Omnibus Crime Control and Safe Streets Act of 1968, S.Rep.No.1097, 90th Cong., 2d Sess. (1968), explicitly states that a pen register is not an interception under Title III:

> "Paragraph (4) defines 'intercept' to include the aural acquisition of the contents of any wire or oral communication by any electronic, mechanical, or other device. Other forms of surveillance are not within the proposed legislation. See Lee v. United States, 47 S.Ct. 746, 274 U.S. 559 [71 L.Ed. 1202] (1927); Corngold v. United States, 367 F.2d [1] (9th 1966). An examination of telephone company records by law enforcement agents in the regular course of their duties would be lawful because it would not be an 'interception.' (United States v. Russo, 250 F.Supp. 55 (E.D.Pa.1966)).

The proposed legislation is not designed to prevent the tracing of phone calls. *The use of a 'pen register,' for example, would be permissible.* But see United States v. Dote, 371 F.2d 176 (7th 1966). *The proposed legislation is intended to protect the privacy of the communication itself and not the means of communication.*" (Emphasis added). 1968 U.S.Code Cong. & Admin.News, p. 2178.

However, even if this clear congressional intent were not demonstrated, the testimony as to the operation of the type of pen register device utilized in this case by the expert witness, Girvan N. Snider, clearly shows that the device as used here did not make "aural acquisitions" within the meaning of § 2510(4).

The telephone which was in Giordano's apartment was a rotary dial type rather than a touch tone type (Tr. 3:355; 6:1030). The pen register device used in this case is known as a TR-12 touch tone decoder with a "dial add-on" (Tr. 3:356; 6:1023-1024). The TR-12 touch tone decoder is the modern device used as a pen register for touch tone phones whereas the same device with a "dial add-on" is used for dial phones (Tr. 6:1024).

In the case of a rotary dial phone, when a digit is dialed, a switch is opened and closed a corresponding number of times to the digit dialed which in turn interrupts the direct current on the line and causes the voltage of the electrical current to rise or fall the corresponding number of times (Tr. 6:1027). The TR-12 touch tone decoder with dial add-on, through its circuitry counts the number of pulses in the electrical energy caused by the changes in voltage, and causes the digit dialed on the telephone to be printed in arabic numerals corresponding to the number of electric pulses (Tr. 6:1027-1031). The only difference in function between an old style pen register, used for a rotary dial phone, and a TR-12 touch tone record with a dial add-on is that the former printed out a number of dots corresponding in

number to the digit dialed while the latter actually prints out the arabic numeral (Tr. 6:1038–1039).

In the case of a touch tone telephone, the press of a button on the face of the phone activates an electrical oscillator, which generates two alternating electrical currents at frequencies assigned by the telephone company to correspond to the particular button pushed. The TR–12 touch tone decoder detects these electrical currents at the varying frequencies and determines the arabic number to which the various combinations of frequencies of electrical current have previously been assigned by the telephone company. The TR–12 then prints out that arabic number (Tr. 6:1040–1048). The old style pen register will not work on a touch tone phone (Tr. 6:1039).

In both the rotary dial phone and the touch tone phone, when the receiver is taken off the hook, a drop in electrical voltage occurs on the telephone lines which can be detected by a voltmeter (Tr. 6:1040).

The TR–12 decoder, with or without the dial add-on, does not hear sound (Tr. 6:1045). It merely detects changes in electrical currents, voltages, and frequencies. The TR–12, however, does have some connection with aural frequencies in that electrical impulses can be converted to aural vibrations through a transducer such as a headphone or loudspeaker. (Tr. 3:351). The TR–12, when used as a decoder only, is not equipped with a transducer and does not convert the electrical impulses into aural ones even though some of the electrical impulses might be in the aural range. (Tr. 6:1056–1061). There is no evidence that at any time during the use of the TR–12 touch tone decoder on the Giordano telephone that a transducer was used as a part of the pen register function. There is no evidence that the TR–12 was used for any purpose other than to record the numbers of telephones to which outgoing calls were made on the Giordano phone and to record the fact the Giordano phone was in use. Both of these uses of the TR–12 involved the measurement of electrical impulses, frequencies and voltages and not the interception or use of aural impulses.

Since the TR–12 touch tone decoder, either with or without the dial add-on, does not involve the interception, acquisition, or use of aural impulses, it is not the instrument by which an aural interception takes place within the meaning of § 2510(4), provided, of course, that transducers are not used to convert the electrical impulses to sound impulses. For this reason, the requirements of Title III do not apply to the installation of a TR–12 touch tone decoder so long as it is not used with a transducer to convert the electrical impulses to sound impulses either contemporaneously with the receipt of the electrical impulse or subsequently.

Although adherence to the requirements of Title III is not required for the installation of a pen register device, it is nevertheless possible that the Fourth Amendment would prohibit as an unreasonable search the installation of such a device on a telephone line without the issuance of a warrant upon probable cause. See *Dote* and *Caplan, supra.* In any event, in the present case the government filed its application for the installation of a pen register as an application in the nature of a request for a search warrant under the provisions of Rule 41 F.R.Crim.P. The original application of October 8, 1970, and the subsequent applications of October 22 and November 6, 1970, have been attacked on the ground that there was no sufficient showing of probable cause.

The order of October 8, 1970 (Misc. 737–N) states that there is probable cause to believe that Nicholas Giordina of Baltimore, Maryland "is committing, and is about to commit, and is conspiring with other persons to commit, offenses involving the sale of narcotic drugs," that there is probable cause to believe that the telephone subscribed to by Nicholas Giordina and carrying number 685–0211 is being used in connection with the commission of the above mentioned offenses, and that there is further prob-

able cause to believe that "telephone numbers presently being called from the telephone subscribed to by Nicholas Giordina . . . are being called by Nicholas Giordina and that these calls relate to narcotics transactions."

The affidavit of BNDD agent Wayne A. Ambrose, Jr., which accompanied the application for the October 8, 1970 order, sets forth the following facts to establish the government's position that sufficient probable cause existed to justify the installation of a pen register device. Ambrose stated that a confidential informant told him that Nicholas Giordina, alias "Nick," had given the informant telephone number 685-0211 and had told the informant to call that telephone number when he wished to "transact narcotic business." On October 2, 1970, the informant made a call, which the affiant monitored with the informant's permission, to telephone number 685-0211 and negotiated for a sale of heroin with "Nick." The affiant monitored a second call to telephone number 685-0211 from the informant to "Giordina" on October 5, 1970. "Giordina" stated during the conversation that he was ready to do business at 7 p. m. A purchase was made from "Giordina" at 7:30 that evening of 110 grams of heroin (39% pure) by Special Agent Glen C. Brown of the BNDD in the presence of the informant. In addition to the above information, the affiant stated that records of toll calls for telephone number 685-0211 had been subpoenaed from the telephone company. These records (which were attached to the affidavit) revealed, according to the affidavit, that several toll calls had been made from this telephone to the residence of two named Washington area narcotics violators well known to the BNDD.

 Within the four corners of the affidavit, this court believes that there is sufficient reliable information to support Chief Judge Northrop's finding that probable cause existed and that the installation of a pen register was justified. Even though an informant's tip

was part of the basis for believing probable cause to exist for the issuance of the warrant, it does not necessarily follow that the validity of the warrant depends upon the reliability of the informant and on the tests of Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L. Ed.2d 637 (1969) and Aquilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). Here the bulk of the evidence establishing the use of the phone by "Giordina" for narcotic business was not dependent upon the hearsay information of the informant, but was instead based on the personal observations of Agent Ambrose himself. The Agent had monitored two narcotics oriented telephone calls to "Giordina" at number 685-0211 which resulted in the sale of heroin to Special Agent Brown. Moreover, he had knowledge of toll calls made from number 685-0211 to the residence of certain Washington narcotics violators. These facts alone would generate sufficient probable cause for the issuance of the order. But even assuming that the reliability of the informant had to be established, this court is of the opinion that the informant's credibility was established through the actions of BNDD Agents Ambrose and Brown which are recited in the affidavit and which corroborated in every detail the informant's statement. This made it apparent that the informant had gained his information in a reliable way. Cf. Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959); Spinelli v. United States, *supra*, 393 U.S. at pp. 416–417, 89 S.Ct. 584.

The subsequent extension orders are not supported by sufficient showings of probable cause, however, for the reason that information was used to obtain those extension orders from a Title III wiretap which, for reasons appearing later in this opinion, was defective. The "fruit of the poisonous tree" doctrine requires the suppression of all pen register information obtained under the subsequent orders. Nardone v. United States, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939); 18 U.S.C. § 2518(10) (a).

## III

### Exhaustion of Investigative Techniques

Defendants contend that other methods of investigation could and should have been used to determine the scope of the alleged narcotics conspiracy in lieu of the wiretap. Their objection to the use of the wiretap is based on 18 U.S.C. § 2518(3) (c) which provides, as a condition precedent to judicial approval of a Title III intercept, that the government establish that "normal investigative procedures have been tried and failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." Many pages of the transcript of the suppression hearings are occupied with testimony on this subject. After reviewing the applications for the intercept and for the extension orders, as well as after review of the testimony at the hearings on these motions, the court finds that this arrow from the collective bow of the defendants falls short of its mark.

The paramount objective of the investigation which centered around defendant Giordano was to uncover the nature, structure, and scope of the narcotics distribution network of which he was thought to be a key figure. It is important to note that the investigation was not directed at disclosing merely the culpability of Giordano. In fact, the affidavit accompanying the application (as well as the testimony at the hearings) clearly indicated that the government already had a substantial case against Giordano prior to the application for the Title III intercept. The reason for the wiretap then was to determine (1) the time, place, and manner of delivery of narcotics to "Giordina" by his suppliers as well as information on the payments by "Giordina" to his suppliers, (2) the time, place, and manner of delivery of narcotics by "Giordina" to his buyers and information relating to the payments to "Giordina" by his buyers (See Application, Misc. No. 739–N, pp. 2–3). This information sought to "reveal the details of the scheme which

has been used by Nicholas Giordina and others as yet unknown to receive, conceal, buy, and sell illegal narcotic drugs, and the identity of his confederates, their places of operation, and the nature of the conspiracy involved therein . . ." *Ibid* at p. 4. The efforts of the government to exhaust other normal investigative techniques must be considered in light of that purpose.

Defendants have advanced numerous examples of investigative techniques that they contend could have been used against Giordano but were not employed. They allege that the government did not sufficiently check with agencies such as the FBI, the Internal Revenue Service, the Social Security Administration, and the Maryland State, New York City, and Baltimore City Police to establish the true identity of Giordano and to identify contacts of associates of his before resorting to the wiretap. It is also contended that if the government had thoroughly inquired further at places that Giordano frequented such as Bickford's Restaurant, the Al-Ho Tavern, Robinson's Athletic Club, and his former place of employment, Goldbloom's Men's Store, that enough information could have been gathered to make the wiretap unnecessary. Moreover, it has been asserted that investigative techniques, such as surveillance and the questioning of known associates of Giordano, were not used to their fullest potential.

Had the sole purpose of the investigation been to disclose only Giordano's culpability in the narcotics trade, these arguments would be very persuasive. However, the investigation was not so limited. Moreover, the averments in the affidavit of Special Agent Ambrose, which accompanied the application, clearly indicated that a myriad of techniques had been tried and failed and had small potential for success in the future. Particularly significant were the following averments by Ambrose.

"A. Criminal record checks on Giordina with the Maryland State Police, Baltimore City Police Department, Baltimore County Police De-

partment, Baltimore Regional Office, and New York Regional Office, BNDD and the New York City Police Department have met with negative results.

\* \* \* \* \* \*

"E. Giordina lives in Apartment 1304, 8 Charles Plaza, Baltimore, Maryland. This building is a high-rise apartment house located between Charles and Liberty Streets, and Saratoga and Baltimore Streets, Baltimore, Maryland. Eight Charles Plaza is located in a complex, and the buildings known as Charles Plaza consist of stores, shops, theaters, and other establishments. There are two main entrances to 8 Charles Plaza which remain locked at all times, and under security guard, with a television monitoring system. There are other means of egress from and ingress to the apartment complex through underground garages. The nature of this arrangement makes effective surveillance of Giordina almost impossible. Full scale surveillance by BNDD has been attempted from October 5 to date. It has met with very limited success. Effective surveillance would be impossible without the knowledge and active aid of apartment security guards and they could not be informed of BNDD surveillance without compromising the investigation. The 'pen register' documents a number of calls from 685–0211 to the apartment security desk.

\* \* \* \* \* \*

"G. Only one informant, SE–1, has been developed who has had dealings with Giordina. SE–1 is not a confidant of Giordina and SE–1 only purchases narcotics from him. It is not possible for SE–1 to attempt to infiltrate Giordina's organization without arousing suspicion.

"H. Other individuals both referred to in this affidavit and not referred to herein, who are connected with Giordina, cannot be approached to give information with regard to Giordina without the danger of them inform-

ing him of the pendency of a BNDD investigation.

\* \* \* \* \* \*

"J. The 'pen register' has shown so far that Giordina receives numerous incoming calls. Without a wire intercept, it would be nearly impossible to identify the individuals making these incoming calls, from whom these narcotics are coming, how, where, when and by what method they are locally distributed.

\* \* \* \* \* \*

"L. Unless electronic surveillance were instituted for number (301) 585–0211, further investigation of Giordina could not progress. He could be arrested, but knowledge of his source of supply and method of distribution would be almost totally lacking."

Likewise, the affidavit of BNDD Agent Azzam, which accompanied the application for the Title III extension order, clearly showed that the use of conventional investigative techniques still had proved fruitless as of November 6, 1970, when the extension application was made. In that affidavit, Agent Azzam stated that because Giordano (who by that time had been correctly identified) would deal only with people he trusted, infiltration of the group of Giordano's associates remained impossible. He also stated that Giordano's wariness of strangers, his extreme caution, and his use of various counter-surveillance techniques made conventional surveillance completely ineffective. During this time, as well, Giordano changed his telephone number.

■ The issuing judge, based on the affidavits submitted to him as appear in the record in Misc. No. 739–N, had in this court's opinion ample justification under the circumstances to make the finding required by § 2518(3) (c), both as to the original order and the extension. Cf. United States v. Leta, *supra,* 332 F.Supp. at 1362–1363.

■ Generally, where an affidavit is the only matter presented to the issuing judge the warrant must stand or fall on

**1044**

the contents of the affidavit alone and what is adduced at a subsequent hearing on a motion to suppress cannot be used by the trial court to augment an otherwise defective affidavit. United States v. Melvin, 419 F.2d 136, 140 (4th Cir. 1969); United States v. Roth, 391 F.2d 507, 509 (7th Cir. 1967). But if a subsequent hearing discloses gross errors in the assertions of an affidavit, these must be considered by the trial judge in determining whether the requirements for the issuance of the warrant were satisfied. United States v. Roth, *supra*, at 509; King v. United States, 282 F.2d 398 (4th Cir. 1960). After reviewing the testimony taken at the suppression hearing, I am satisfied that the averments of the affidavit were neither discredited nor impeached. At most, the advantages of hindsight were proved at the suppression hearings once again to be much more certain than those of foresight. The BNDD agents are not required, however, to prove to a certainty that normal techniques of investigation will not succeed. They need only show that they "reasonably appear unlikely to succeed if tried." Section 2518(3) (c). This the BNDD agents did at the time of the respective applications to the court.

### IV

#### Minimization

To prevent improper invasion of the right of privacy provided by the Fourth Amendment and to curtail the indiscriminate seizure of communications, Congress incorporated into Title III certain safeguards. Among these measures was the provision contained in 18 U.S.C. § 2518(5) which provides in pertinent part that:

"Every order . . . shall contain a provision that the authorization to intercept . . . shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception . . ."

Unfortunately there are no statutory guidelines elucidating how minimization is to be effected. The cases interpreting this minimization provision are not entirely clear, nor consistent, nor abundant. This court is aware of only three decisions directly on the subject, United States v. King, 335 F.Supp. 523 (S.D. Cal.1971); United States v. Leta, *supra*; and United States v. Scott, *supra*.

In the *Scott* case, Judge Waddy relied heavily upon a statistical breakdown of the telephone calls intercepted in reaching his ultimate conclusion to suppress *all* telephone calls because of the government's failure to minimize its surveillance. Pursuant to a Title III court order to conduct a wiretap for the purpose of acquiring information pertaining to narcotics violations, the government in that case intercepted and recorded virtually all conversations in spite of the order's unequivocal mandate to minimize. Approximately 60% of the calls intercepted were completely unrelated to narcotics. Although Judge Waddy found neither of these facts standing alone to be conclusive, he stated that ". . . together they strongly indicate the indiscriminate use of wire surveillance that was proscribed by *Katz* and *Berger*." 331 F.Supp. at 247. Moreover, Judge Waddy gave particular significance to the fact that the surveillants did not even attempt "lip service compliance" with the provisions of the order and the statutory mandate but instead completely disregarded it. *Ibid.* In concluding that *all* calls should be suppressed because of the government's complete failure to minimize, Judge Waddy stated:

"If this Court were to allow the Government agents to indiscriminately intercept every conversation made and to continue monitoring such calls when it becomes clear that they are not related to the 'authorized objectives' of the wiretap and in violation of the limiting provisions of the order such order would become meaningless verbiage and the protections to the right of privacy outlined in *Berger* and *Katz* would be illusory." *Ibid* at 248.

Although giving some weight to the statistical analysis of intercepted conversations, Judge Nielsen in the *King* case relied more heavily on other grounds in reaching the conclusion that failure to minimize warranted only *partial*, not complete, suppression of intercepted communications. As in *Scott*, the government agents, pursuant to a Title III court order to conduct a telephone surveillance to obtain information of narcotics violations, maintained a wiretap on defendant King's telephone for a total of 45 days, 24 hours a day. Contrary to *Scott*, Judge Nielsen rejected the premise that ". . . the great delicacy which inheres in a wiretap situation sets it so far apart from other types of searches and seizures that error as to the conduct of a part of the surveillance renders the entire interception invalid." 335 F.Supp. at 544. Rather, he based his decision on the framework of the general law of search and seizure.

Judge Nielsen was careful to distinguish the wiretap in *King* from other situations where some violation of Fourth Amendment rights tainted the entire search and seizure, compelling complete suppression. In *Berger* and *Katz*, the two most significant decisions in the area of electronic surveillance, he reasoned that there was total suppression because both surveillances were void *ab initio*, in the latter case because of a lack of court authorization and in the former because the statute under which the wiretap was conducted was unconstitutional. In contrast to these cases, Judge Nielsen in *King* observed that the defect in the wiretap in his case lay in the carrying out of the court order by the law enforcement officers and not in the statute or order themselves. Relying on Marron v. United States, 275 U.S. 192, 48 S.Ct. 74, 72 L.Ed. 231 (1927) and Rule 41(e) F.R.Crim.P., Judge Nielsen determined that an item-by-item consideration of the warrant and the items seized pursuant thereto was required. But more significantly, he stated that in the ordinary case, the seizure of some items of evidence in excess of those specified in a search warrant does not result in the suppression of those items which were validly seized. From this principle he concluded that he would entertain objections to the introduction of a particular item into evidence at trial on the ground "that the interception by which it was obtained was beyond the scope of the authorizing order." 335 F.Supp. at 545. Judge Neilsen ended his discussion of minimization with the following admonition:

"That this Court has declined to suppress the entire wire interception should in no way be taken as judicial approval of the Government's tactics. By failing to minimize surveillance in accordance with the statute and the authorizing order, the Government has placed upon this Court the burden of effecting minimization, a situation hardly envisioned by the statute, and one which this Court does not willingly accept. The Government would do well to remember that the limited system which the statute creates is designed to prevent unreasonable invasions of privacy, not to repair them, and that if those limitations are not voluntarily adhered to by the Government, total suppression may well prove to be the only feasible solution." *Supra*, p. 545.

Although Judge Muir's opinion in United States v. Leta, *supra*, does not speak directly to the question of whether efforts were made to minimize in that case, it nevertheless does contain incisive insights into the concept of minimization. *Leta* begins with the premise that "the seizure of items which have not been particularly described does not *per se* vitiate the entire search; the entire search is vitiated only if it is unreasonable." 332 F.Supp. at 1360. Moreover, unlike *King* and *Scott*, *Leta* appears to say that with regard to wiretaps, reasonableness is determined by the standards set forth in Title III. Thus, if a wiretap does not comport with the mandates of Title III, it becomes *prima facie* unreasonable. The language in footnote 4 on

p. 1360 of *Leta* seems to confirm this interpretation:

"There may be some situations in which it will be necessary to record 100% of the conversations over a particular phone. This necessity, by itself, would not make the seizure unreasonable. However, it may also be that 100% recording will take place without an effort to minimize where possible. In such a situation, 18 U.S.C. § 2518 (5) will have been violated and it would appear that under 18 U.S.C. § 2518(10), as well as the Fourth Amendment, all the seized conversations would have to be excluded from use by the government."

■ The meaning of the words of the statute relating to minimization is best found, this court believes, in the language itself. What is required is the minimization of " . . . the interception of communications not otherwise subject to interception under this chapter . . ." Section 2518(5). It does not say that *no* such communication can be intercepted, but only that the interception of such communications should be minimized. The verb "minimize" is defined in Webster's New Third International Dictionary as meaning:

"to reduce to the smallest possible number, degree or extent."

The communications which are not subject to interception under Title III are those which, under the provisions of §§ 2516(1) (a) through 2516(1) (f), do not provide evidence of the commission of certain enumerated crimes or of a conspiracy to commit the same. Therefore, the minimization requirement of § 2518 (5) means that the intercept procedure shall be conducted in such a way as to reduce to the smallest possible number the interception of communications which do not provide evidence relating to the commission of any of the crimes set forth in §§ 2516(1) (a)–2516(1) (f).

■ *Scott, King* and *Leta,* as well as a common sense approach to the problem lead one to the conclusion that there can be essentially two different types of violation of the *minimization requirement* of § 2518(5). The first type of violation would be the one committed if there had been no attempt at all to minimize the interception of "innocent" calls. This first type of violation would obviously be a blatant violation of the provisions of Title III and, in addition, would probably violate the precepts of the Fourth Amendment.[3] The second type of violation of the minimization requirement would be the one committed if there is an inadequate method or effort to minimize. The violation, if any, that occurred here would have to be of the second type under the facts developed at the hearings on the motions to suppress. The standard to be applied to determine whether or not a violation of the second type has occurred will be discussed at length later.

■ In either type of violation of the minimization requirement, a question necessarily arises as to the extent of the prophylactic remedies necessary to give the requirement meaning. In this court's opinion the minimization requirement of § 2518(5) would be illusory if it were enforced on an item-by-item basis by means of suppressing unauthorized seizures at trial *after* the interception is a *fait accompli*. Minimization as required by the statute must be employed by the law enforcement officers *during* the wiretap, not by the court *after* the wire-

3. It is possible that the Fourth Amendment would not condemn a series of interceptions of calls made to or from a known conspirator, even though many of those calls turned out to be "innocent" calls, provided that all the other requirements of the type imposed by Title III were met. Mr. Justice Stewart in Katz v. United States, *supra*, 389 U.S. at 354, 88 S.Ct. 507, indicated that it was of great significance in that case that only the calls of the putative defendant were monitored and that the government agents conducted their surveillance only when he was using the telephone booth to which the wiretap was connected. Whether this means that the Fourth Amendment requires a lesser degree of minimization than Title III is a question which it is not necessary here to decide. Cf. United States v. Scott, *supra*, 331 F.Supp. at 247.

tap. Although Judge Nielsen approved an item-by-item wiretap approach in United States v. King, *supra,* he himself provided a strong argument against such an approach when he said in *King,* " . . . the limited system which the statute creates is designed to *prevent* unreasonable invasions of privacy, not to *repair* them. . . . " (Emphasis added.) *Supra,* p. 545. While partial suppression under Rule 41(c) F.R.Crim.P. may act as a sufficient prophylactic measure in the context of seizures of physical objects, the seizure of conversations differs so significantly as to warrant a stronger safeguard. Knowing that only "innocent" calls would be suppressed, the government could intercept every conversation during the entire period of a wiretap with nothing to lose by doing so since it would use at trial only those conversations which had definite incriminating value anyway, thereby completely ignoring the minimization mandate of Title III. A conversation once seized can never truly be given back as can a physical object. The right of privacy protected by the Fourth Amendment has been more invaded where a conversation which can never be returned has been seized than where a physical object which can be returned has been seized. There is more reason, therefore, to require a more strict rule than the partial suggestion remedy advanced by Judge Nielsen in *King, supra.* For these reasons, this court rules that a failure by the government to comply with the § 2518(5) minimization requirement would require total suppression of all of the communications intercepted.

Since total suppression is the remedy, the question remains whether the government in this case did violate the minimization requirement by adopting an inadequate method or effort to accomplish minimization. What, then, is the standard by which the government methods or efforts must be measured?

Section 2518(5), as has been seen, requires the intercept procedure to be conducted so as to reduce to the smallest possible number the interception of "innocent" calls. In this context the word "possible" means "feasible" or "practicable" while still allowing the legitimate law enforcement aims of the statute to be accomplished. This is but another way of saying that the methods and efforts utilized in minimization must be reasonable, the traditional and acceptable standard of measuring the validity of a search under the Fourth Amendment, Berger v. New York, *supra,* 388 U.S. at 53, 87 S.Ct. 1873, and must allow " . . . no greater invasion of privacy . . . than [is] necessary under the circumstances." Berger v. New York, supra, at 57, 87 S.Ct. at 1883; Katz v. United States, *supra,* 389 U.S. at 355, 88 S.Ct. 507.

What is "reasonable," "practicable," or "feasible" depends upon the facts and circumstances in each case. *Ibid.* It is certainly unreasonable and goes beyond the limits of practicability or feasibility in every case to give a seizing officer what the *Berger* court characterized as a "roving commission to 'seize' any and all conversations." 388 U.S. at 59, 87 S.Ct. at 1883. But it is not unreasonable to recognize that it is much easier to describe with particularity in a warrant the nature and contents of a physical object than a conversation which has not yet been heard. In the former case the law enforcement officer can by sight and touch generally determine before he takes the item into his custody whether it is something which he is authorized to seize by the warrant while in the latter case he can generally determine with exactness whether the conversation is authorized to be seized by the warrant only when he has already taken it into custody by having heard it in its entirety.

In the present case the primary purpose of the wiretap was not to accumulate evidence against Giordano, but rather to determine the scope of the alleged narcotics conspiracy and to determine its method of operation, all of which was unknown on October 16, 1970. (Tr. 12:2063). Thus all individuals whom Giordano called or who called him at that time were putative defendants. It had

already been established through the calls by the confidential informant to Giordano with BNDD Agent Ambrose listening that Giordano used the telephone to some extent to arrange for sales of narcotics. But as the government has pointed out, this increased the minimization problem because upon the decision to cease monitoring certain individuals, those individuals could no longer be considered defendants since "selective" monitoring of their conversations with Giordano would destroy the evidence value as to them. Decisions on minimization became more difficult in light of the substantial number of calls involving gambling which would appear to be subject to interception under §§ 2516(1)(c) and 2517(5). In addition Giordano had a number of calls to and from women, a circumstance which the BNDD agents did not know were "innocent" calls initially since it was their general experience that narcotics dealers frequently made wide use of their women in furthering their narcotics traffic. (E. g. Tr. 12:2060–68). Similarly, BNDD agents in their experience felt that, particularly in drug traffic, many seemingly innocuous calls in general contained information pertaining to the drug operation. (Tr. 12:2060).

The intercept went into effect on Giordano's phone on October 16, 1970, after the order was signed by Chief Judge Northrop. Agent Azzam, group supervisor of the BNDD and the agent in charge of the Giordano intercept under the general supervision of Mr. Brocato, testified that there were fourteen (14) agents from time to time who monitored the equipment. (Tr. 10:1720). Each agent who listened kept a log of (1) the footage of the recording tape, (2) the telephone number dialed, (3) the code number for each call, and (4) notes regarding the contents of each call. (Tr. 10:1716). From the inception of the intercept on October 16, 1971, until the initial classification of "innocent" calls was made, Agent Azzam stated that there was a constant dialogue both among the agents and with the Assistant United States Attorney, Mr. Brocato, regarding the provisions of the order and the issue of minimization. (Tr. 10:1725–32). Although Agent Azzam testified that he did not have knowledge of how to minimize the intercepts (Tr. 10:1728), he stated that Mr. Brocato determined that some form of minimization would have to be effected. (Tr. 10:1733). He went on to state that on October 26, 1970, Mr. Brocato told him to prepare a synopsis of the calls thus far intercepted. (Tr. 10:1734). When he, his supervisors, and Mr. Brocato analyzed the list prepared, it was concluded that the pattern of certain of the outgoing and incoming calls were of a personal nature and apparently not related to illegal drug traffic. (Tr. 10:1734–35). As a result of this analysis, Mr. Brocato prepared a written list of *telephone numbers* that the agents were *not to listen to* when those telephone numbers were called. (Tr. 10:1735). Also instructions were given at this time to cut off the *monitoring of any conversations with* females who did not immediately begin talking about drugs or gambling. (Tr. 10:1746). From the testimony it appears that the list of telephone numbers contained about ten (10) numbers. (Tr. 10:1738). Agent Azzam testified further that this plan for minimizing interceptions went into effect sometime between October 28 and 29, 1971. (Tr. 10:1754). At this time techniques were also developed to record the daily statistical nature of monitored calls. (Tr. 10:-1740). This plan for minimization was instituted under the supervision of the authorizing judge, Chief Judge Northrop. The reports submitted to him on October 21, 1970 and on October 26, 1970 apprised him fully of the progress of wiretap. He was advised that "guarded conversations, using code words, involving narcotics" were being used, that all calls were being intercepted and that the percentage of narcotic related interceptions appeared low. The last paragraph of the report of October 26, 1970 by the Assistant United States Attorney sum-

marized the status of the wiretap prior to minimization:

"A total of 155 conversations have been intercepted during the period of this report. Approximately 13 conversations appear to be of an incriminatory nature. I am presently reviewing the logs and following the precepts of Katz v. United States. I will order that calls to numbers which apparently have not related to narcotics traffic will cease to be monitored." Misc. No. 739, Paper No. 5.

Although statistical breakdowns are by no means determinative of the issue of minimization, they do offer some insight on that issue. The statistics of the government show that 1613 calls were made to and from the Giordano telephone during the pendency of the Title III interception. Of that number, 983 calls involved situations, the government contends, where no conversation ensued (the line was busy, no one was home, etc.). Of the remaining 630 calls, 355 were monitored completely and 275 were categorized as "not monitored." [4] Of the monitored conversations, the government has alleged that 102 involved narcotics and 75 involved gambling (a total of 177). Thus, the government has asserted that approximately 50% of the total monitored conversations involved illegality and 30% involved narcotics. However, the statistics of the government appear to reflect the maximum percentage of calls that could be classified as "narcotics related." The defendants have argued that many of these government labeled "narcotics related" calls do not, in fact, have anything to do with narcotics. Also defendants have averred that many of the calls classified by the government as "not monitored" were monitored by the government in whole or in part and should be so designated in the statistics. Because the validity of the statistics and the designation and compilation of the calls contained in them are subject to divergent viewpoints, this court believes that these statistics must be viewed with some skepticism. The statistics do show, however, that a substantial effort was made to limit the number of interceptions. Taking the government figures at their best, 178 "innocent" calls were completely monitored out of a total of 630 completed calls, which means that 72% of the completed calls were either not intercepted or were of an incriminating nature. While the exact figures may be indispute, at least arguably the government attemped to minimize "innocent" interceptions. Also to be borne in mind is that the above statistics include all calls both before October 29, 1970, when admittedly the government was monitoring all calls, as well as after that date when Agent Azzam testified that the pattern had been sufficiently established in Giordano's calls to allow Mr. Brocato to prepare the instructions on persons, phone numbers, and types of calls which were to be excluded from interception.

While it is argued that the limiting instructions and procedures should have been instituted at a much earlier date, that is a question upon which reasonable men could differ. As Agent Azzam said in his testimony:

"It seems to me that the order is quite clear that [the interception of] personal conversations . . . [is] to be minimized, but before a conversation can be categorized as personal, it has to be listened to, and after a pattern is established, which is what happened here, certain specific persons and types of calls were made taboo for us to intercept.

"As I have stated, some numbers were definitely not to be monitored, and then there was a general rule, specifically general rule of thumb, that any phone calls from females to Gior-

---

4. Calls classified as "not monitored," the government has stated, are those where no conversation was overheard, a small portion of the conversation was overheard until a prescribed voice or a pre- scribed telephone number (previously identified) had been ascertained or until the gist of the conversation was determined to be non-narcotics related.

dano would not be monitored. But that occurred after an analysis of many, many phone calls between him and several women." (Tr. 10:1807–08).

■ Although total interception for 12 to 13 days may well be unreasonable under ordinary circumstances to establish a pattern, it does not seem to the court unreasonable here where there was an alleged narcotics conspiracy involving an unknown number of persons and where it was extremely difficult, if not impossible, to determine which calls were "innocent" in advance of obtaining a reliable pattern.

■ For the above reasons this court finds that the allegation of the defendants that the government failed to minimize interceptions in accordance with § 2518(5) to be without merit.

V

*Additional Arguments of Defendants*

In addition to the points raised in the original motions to suppress which have previously been discussed in this opinion, defendants have challenged the Title III intercept in this case on the following grounds:

1. The applications for the initial Title III intercept and the extension did not establish probable cause;

2. The period of interception was unreasonably long; and

3. The applications and orders did not comply with the statutory requirements of § 2518(1) and (4),[5] regarding certain information which must be set forth in the order and application for a Title III interception.

■ As to defendants' first contention this court has concluded that it is wholly without merit.[6] In both the October 16, 1970 application and the extension application of November 6, 1970, there was ample evidence of probable cause to justify the issuance of orders for Title III intercepts. Since a detailed analysis of the evidence constituting the grounds for probable cause in these two applications would be more academic than enlightening, let it suffice to say that the pen register information, the toll record information coupled with the information, regarding the activities of Giordano himself, including the sale by Giordano of 110 grams of heroin to Special Agent Brown, BNDD, all of which information is set forth in the affidavits accompanying the application, sufficiently establishes probable cause for the issuance of the October 16, 1970 intercept. The affidavits accompanying the November 6, 1970 extension application include facts of alleged narcotics dealings between Giordano and other of the defendants derived from the Title III intercept which had been in effect and also facts of another sale of heroin to Special Agent Brown by Giordano. Although there is other supporting information, these facts alone would generate enough probable cause to justify the issuance of the extension intercept order. Thus, all of defendants' arguments regarding the question of probable cause must fail.

■ Defendant's second contention, that the period of interception was unnecessarily long, can be dismissed summarily. Since both the initial intercept and the extension were each conducted for a period of time less than 30 days, the maximum period allowed by the statute for any one intercept, and since there is no evidence to support a finding that the intercepts in these cases lasted longer than necessary "to achieve the

---

5. The question of authorization for the intercept will not be treated in this section but will be discussed in the final section of this opinion. See pp. 1051–1060 *infra*.

6. This section of this opinion does not consider the effect of the conclusions of Section VI thereof. Since the results

of the interceptions conducted under the original Title III order must be suppressed for the reasons set forth in Section VI of this opinion, the probable cause for the extension order, based in part on those initial wiretap results, would necessarily be insufficient. 18 U.S. C. § 2518(10) (a).

objective of the authorization,"[7] neither intercept was unnecessarily long. See United States v. Leta, *supra*, 332 F.Supp. at 1360–1361.

Likewise, defendants' final contention regarding the contents of the applications and orders can be dealt with in summary fashion. This court has reviewed all of the challenged orders and applications in this case regarding Title III intercepts and has found that, except for the requirements regarding authorization which will be discussed in Section VI, *infra,* all the information required under section 2518(1) with regard to applications and section 2518(4) with regard to orders was sufficiently set forth.

## VI

### *Authorization of the Applications*

Subsequent to the filing of, and hearings upon, the original motions to suppress in this case, United States v. Robinson, 40 L.W. 2454 (5th Cir., Jan. 12, 1972), holding the Title III wiretap in that case invalid, was decided. Revelations were made in that opinion that neither the Attorney General of the United States nor any Assistant Attorney General had personally authorized the application for the Title III wiretap involved in that proceeding. Although it had previously been represented to this court that Will Wilson, an Assistant Attorney General at the time of the filing of the wiretap application, had personally approved and authorized the same, the revelations of *Robinson* as to the procedure utilized in that case for the authorization of the application prompted a renewed inquiry by certain defense counsel as to the exact procedure of authorization followed in this case. When it became apparent that there was at least some uncertainty as to the authorization procedures followed prior to the filing of the application for the wiretap in this case, an order was issued requiring the government to set forth the relevant facts pertaining to the authorization procedures followed and granting the defendants leave to file supplemental motions to suppress if, in their judgment, the facts warranted such action.

The government filed the affidavit of Sol Lindenbaum, the Executive Assistant to the Attorney General of the United States, and the affidavit of Harold P. Shapiro, a Deputy Assistant Attorney General in the Criminal Division of the United States Department of Justice.

Mr. Lindenbaum's affidavit stated that the then Attorney General, the Honorable John N. Mitchell, had refrained from designating any Assistant Attorney General to authorize, without his approval, the filing of an application for a wiretap under 18 U.S.C. § 2516(1) and that, instead, Attorney General Mitchell had required that all requests for such authorization be referred to him for consideration. Lindenbaum further stated that he had, in the normal course of his duties, reviewed such requests since February, 1969 and had made recommendations to the Attorney General thereon, in the course of which Mr. Lindenbaum became familiar with the statutory provisions relating thereto and to the actions of the Attorney General thereon. Mr. Lindenbaum stated that on October 16, 1970, at a time when the Attorney General was on a trip away from Washington, D. C., a request for approval of an authorization to apply for a wiretap order in this case was forwarded to the Attorney General's office, together with a recommendation for approval from the Criminal Division of the Department of Justice. In the absence of the Attorney General, Mr. Lindenbaum, according to his affidavit, reviewed the application and its supporting documents and concluded, from his knowledge of the Attorney General's actions on previous cases, that Attorney General Mitchell would have approved the request if it had been submitted to him personally. Acting pursuant to a general authorization which had been

---

7. 18 U.S.C. § 2518(5).

given to him by the Attorney General to act in such circumstances, Mr. Lindenbaum approved the authorization request and placed the Attorney General's initials on a memorandum to Will Wilson, then Assistant Attorney General in charge of the Criminal Division of the Department of Justice, approving ". . . a request that authorization be given to Francis S. Brocato to make application for an interception order." (See Lindenbaum's affidavit, p. 2). On November 6, 1970, the Attorney General personally approved a request that authorization be given to Mr. Brocato to make application for an order continuing the interception of the Giordano telephone in Baltimore and personally initialed a memorandum of that date to Will Wilson reflecting his favorable action on the request.

Mr. Shapiro's affidavit set forth details of the processing of the wiretap applications in this case within the Criminal Division of the Department of Justice prior to the forwarding of the respective applications to the Office of the Attorney General for approval of the authorizations. They were each first reviewed by a staff attorney in a special unit of the Organized Crime and Racketeering Section of the Criminal Division for the purpose of ". . . assuring strict adherence to the required statutory, judicial and constitutional standards." (See Shapiro affidavit, p. 1). They were then submitted for review to Kurt W. Muellenberg, Deputy Chief, and to William S. Lynch, Chief, Organized Crime and Racketeering Section, respectively, who recommended approval and forwarded them to Mr. Shapiro. Mr. Shapiro then, according to his affidavit, ". . . examined the files and forwarded them to the Office of the Attorney General with detailed recommendations that the authorizations be granted." (See Shapiro affidavit, p. 2). As part of his function, Mr. Shapiro reviewed the letters of October 16 and November 6, 1970, respectively, purporting to be over the signature of Will Wilson, to Francis S. Brocato, advising him that he was authorized to present the applications to the court, and authorized the dispatch of those letters upon approval of the respective requests for authorization in the Office of the Attorney General.

Neither Mr. Shapiro's affidavit nor that of Mr. Lindenbaum sets forth the identity of the person who prepared the "Will Wilson letters" nor whether Will Wilson, in fact, ever had any knowledge of those letters prior to the respective applications to the court. In view of the government admission at the hearing of the supplemental motions to dismiss, the court need not concern itself with the lack of factual material in reference to these latter points.

Supplemental motions to suppress were filed by certain of the defendants on grounds related to the authorization procedures.

Title 18 U.S.C. § 2516(1) provides, *inter alia*:

"The Attorney General, or any Assistant Attorney General specially designated by the Attorney General, may authorize an application to a Federal judge of competent jurisdiction for . . . an order authorizing or approving the interception of wire or oral communications . . . ."

At the hearing on the supplemental motions to suppress, in response to questions by the court, government counsel admitted that no Assistant Attorney General was specially designated in this case by the Attorney General or on his behalf to exercise independent judgment to authorize a Title III application. The supplemental motions to suppress, therefore, will be decided by this court on the assumption that Will Wilson, as an Assistant Attorney General of the United States, did not perform any function in exercising independent judgment on his own responsibility to authorize the wiretap application in the present case and that his function was only to notify Francis S. Brocato and others concerned that on the authority and the responsibility of the Attorney General himself

the wiretap application had been authorized. In other words, under the admission of the government, Mr. Wilson did not perform a function which was required under the statute to be performed by an Assistant Attorney General but, on the contrary, performed a messenger-type function which, under the statute at least, could have been performed by anyone.

The questions before the court, therefore, are (1) whether or not the purported exercise of the authority and responsibility of the Attorney General in this case, and the procedures followed subsequently relating to the authorization of the application, comport with the statutory requirements of Title III, and (2) if not, whether any failures to comply with the statute are of such a nature as to require suppression of the evidence obtained from the wiretap.

Wiretapping legislation had been considered prior to 1968 in several sessions of the Congress. Especially instructive is a review of S. 1495 presented in the 87th Congress, First Session (1961). Section 4(b) of S. 1495, as originally proposed provided that:

"The Attorney General or any officer of the Department of Justice or any United States attorney specially designated by the Attorney General, may authorize any investigative law enforcement officer of the United Estates or any Federal agency to apply to a judge of competent jurisdiction for leave to intercept wire communications . . . ."

That bill, as originally proposed, did not provide for either the application itself or for the order of court granting the wiretap approval to include any reference to the authorization of the application. Hearings Before the Subcommittee on Constitutional Rights of the Committee on the Judiciary, Wiretapping and Eavesdropping Legislation, 87th Congress, First Session (May 9, 10, 11, 12, 1969) at 4–8.

At hearings on S. 1495 and related legislation, Herbert J. Miller, Jr., then Assistant Attorney General, Criminal Division, Department of Justice, in May 1961, testified in pertinent part as follows:

"This is the approach of S. 1495, with which the Department of Justice is in general agreement. The bill makes wiretapping a crime unless specifically authorized by a Federal judge in situations involving specified crimes. As I understand the bill, the application for a court order could be made only by the authority of the Attorney General or an officer of the Department of Justice or U. S. Attorney authorized by him. I suggest that the bill should confine the power to authorize an application for a court order to the Attorney General and any Assistant Attorney General whom he may designate. This would give greater assurance of a responsible executive determination of the need and justifiability of each interception." *Ibid.* at 356.

On June 21, 1961, the Department of Justice submitted to Congress a proposed revision of S. 1495 which, for the first time, included precisely the same operative language as the present § 2516(1) of Title 18, United States Code. The Department of Justice proposed to modify § 4(b) of S. 1495 to read as follows:

"The Attorney General, or any Assistant Attorney General of the Department of Justice specially designated by the Attorney General, may authorize an application to a judge of competent jurisdiction . . . ." *Ibid.* at 372.

The proposed revision recommended by the Department of Justice at that time to S. 1495 did not provide for the inclusion in the application to the court or in the court's order of any information concerning the authorization for the submission of the application to the court. *Ibid* at 373–378.

On January 25, 1967, Senator McClellan introduced S. 675 dealing with wiretaps. Section 5(a) of the bill provided:

"The Attorney General, or any Assistant Attorney General of the Department of Justice specially designated by the Attorney General, may authorize an application to a Federal judge of competent jurisdiction . . . ." Hearings Before the Subcommittee on Criminal Law and Procedures of the Committee on the Judiciary, Controlling Crime Through More Effective Law Enforcement, 90th Congress, First Session (March 7, 8, 9, 1967) at 76.

S. 675 did not require that either the application or the court order contain any information relating to the authorization of the application. *Ibid* at 75–79.

In 1967 there appeared in print for the first time a proposed bill in substantially the form in which Title III finally emerged. This proposed bill, authored by Professor G. Robert Blakey, then a consultant to the President's Commission on Law Enforcement and Administration of Justice, was attached as Appendix C to the *Task Force Report: Organized Crime* (The President's Commission on Law Enforcement and Administration of Justice). Professor Blakey's proposed bill provided in § 3801(a) thereof that "the Attorney General, or any Assistant Attorney General of the Department of Justice specially designated by the Attorney General may authorize an application to a Federal judge of competent jurisdiction . . . ." and further provided in § 3803(a) (1) thereof for the first time in any proposal that the application to the court for a wiretap should include information on "Who authorized the application." *Ibid* at 108–109. Also for the first time, Blakey's bill provided in § 3804 that reports would be issued on each wiretap application to the Administrative Office of the United States Courts, and ultimately to the Congress, which would contain "the identity of . . . who authorized the application." *Ibid* at 111. Blakey's bill

at that time did not require the inclusion in the court's order of any information relative to the authorization of the application. Ibid. at 110. In the text of the *Task Force Report,* after setting forth that there should be a limitation placed on the number of federal and state enforcement agencies who could employ electronic surveillance techniques, it is stated that "even with this limitation of agencies, the power should be further circumscribed by requiring that the Attorney General (or his designates) shall sign and responsibly review all applications." *Ibid.* at 103.

On June 29, 1967, Senator Hruska and others introduced S. 2050 which followed the Blakey bill very closely. Section 2516(a) of S. 2050, 90th Congress, First Session, provided that "the Attorney General, or any Assistant Attorney General of the Department of Justice specially designated by the Attorney General, may authorize an application to a Federal judge of competent jurisdiction . . . to intercept wire or oral communications . . . ." Hearings Before the Subcommittee on Criminal Laws and Procedures of the Committee on the Judiciary, Controlling Crime Through More Effective Law Enforcement, *supra,* at 1005. Section 2518(a) (1) of S. 2050 required the application to the court to set forth "the identity of the *person* who authorized the application." (Emphasis supplied). *Ibid.* at 1006. S. 2050 did not contain any provision requiring the court's order to contain information concerning the authorization for the application to the court. *Ibid* at 1007. It retained, however, the Blakey bill requirement that a report be filed with the Administrative Office and Congress setting forth "the identity of . . . who authorized the application." *Ibid* at 1008.

On October 12, 1967, H.R. 13482 was introduced in the House, and was then the latest version of what had come to be called the "Blakey bill," Congressional Record-Senate Volume 114, Part 11, page 14473. That bill continued the language of S. 2050 as to (1) requiring that the

Attorney General or a specially designated Assistant Attorney General be the authorizing officer, as to (2) requiring the identity of the authorizing person to be set forth in the application, and as to (3) requiring a report to be filed with the Administrative Office and Congress setting forth the identity of the person who authorized the application. The bill, in section 2518(4) (d) thereof, for the first time required that the order of the court specify " . . . the identity of· whomever authorized., the application." H.R. 13482, 90th Congress, Second Session (1967).

All of the various bills were considered by the Senate Committee on the Judiciary. This Committee in Senate Report 1097, dated April 29, 1968, recommended the passage by the Senate of S. 917, which contained the text of Title III as it was finally enacted by the Congress. U.S.Code Cong. & Admin.News, 90th Cong., 2d Sess. Vol. 2 (1968). Section 2516(1), of course, contained the same language, here relevant, which had appeared in all of the proposals since the Justice Department recommendations in 1961. Section 2518(1) (a) retained the requirement that the application to the court contain the identity of the persons authorizing the application which had first appeared in S. 2050, but in adding a requirement that the identity of the investigative or law enforcement office making the application be provided, it changed the terminology slightly and substituted in this section the words "officer authorizing the application" for "the person who authorized the application." Senate Report 1097, Senate Committee on the Judiciary, 90th Cong. 2d Sess. (1968), p. 15. It does not appear that the change in wording signified any intended change in meaning.

Senate Report 1097 also recommended the requirement, first proposed in H.R. 13482, that the order of court approving the interception contain information about the identity of the person authorizing the application, but the wording establishing that requirement was chang-ed. Section 2518(4) (d) of S. 917 as proposed in the committee report and as finally enacted into law provides that the order shall specify:

"The identity of . . . the *person* authorizing the application;" (Emphasis supplied). *Ibid* at 16.

Section 2519(1) (f) of the bill reported on in Senate Report 1097 retains the concept of reporting to the Administrative Office and to Congress, but changes the wording slightly from previous proposals in requiring that the reports include "the identity of . . . the *person* authorizing the application." (Emphasis supplied). *Ibid* at 18.

The Senate Report, in referring to § 2516(1) states:

"Paragraph (1) provides that the Attorney General, or any Assistant Attorney General of the Department of Justice specifically designated by him, may authorize an application for an order authorizing the interception of wire or oral communications. This provision centralizes in a publicly responsible official subject to the political process the formulation of law enforcement policy on the use of electronic surveillance techniques. Centralization will avoid the possibility that divergent practices might develop. Should abuses occur, the lines of responsibility lead to an identifiable *person*. This provision in itself should go a long way toward guaranteeing that no abuses will happen." (Emphasis supplied). 1968 U.S.Code Cong. & Admin.News, p. 2185.

In referring to § 2518(1) (a) the Committee Report says:

"Subparagraph (a) requires the identity of the *person* who makes, and the *person* who authorized the application to be set out. This fixes responsibility." (Emphasis supplied). *Ibid* at 2189.

In explaining the provisions of § 2518 (4) (d) the Committee Report states:

"Subparagraph (d) requires that the order note the agency authorized to make the interception and the *person*

who authorized the application so that responsibility will be fixed." (Emphasis supplied). *Ibid* at 2192.

The Committee Report does not specifically refer to § 2519(1) (f), but instead states generally:

"Section 2519 of the new chapter provides for a series of reports on the administration of the court order system. They are intended to form the basis for a public evaluation of its operation. The reports are not intended to include confidential material. They should be statistical in character . . . . It will assure the community that the system of court-order electronic surveillance envisioned by the proposed chapter is properly administered and will provide a basis for evaluating its operation." *Ibid* at 2196.

It is significant that the three places in the Committee Report which attempt to explain the meaning of the sections of Title III most relevant to this inquiry do so in terms of "an identifiable person" in each instance even though the word "person" appears only in § 2518(4) (d). This emphasis by the Committee on the use of the word "person" cannot be ignored.

Webster's Third New International Dictionary, Unabridged ( G. & C. Merriam Co. 1966) defines the word "person" in part as follows:

"An individual human being . . . ; the individual personality of a human being . . . . "

 In the context of the Committee Report on the three sections of Title III most relevant to this discussion, this court believes that the word "person" was meant to mean a specific, identifiable, individual human being. Similarly, the word "person" as it appears in § 2518(4) (d) was intended to mean the same thing. Nothing in § 2510(6) of Title 18 leads to a contrary conclusion.

Having said all this, it still remains to determine the legislative intent or statutory scheme of Title III. As has been seen, one concern in the framing of Title III was to place the authority and responsibility for determining whether or not to seek a court order allowing an interception in a " . . . publicly responsible official subject to the political process . . . . " 1968 U.S. Cong. & Admin.News, p. 2185. The framers of Title III further reasoned that "centralization will avoid the possibility that divergent practices might develop." These reasons relate, however, solely to the *fact* of authorization of the application to the court and not to the knowledge by others outside of the Department of Justice of the identity of the person who had in fact previously authorized the application.

Placement of the authority to make the decision of whether or not to authorize an application for a wiretap in the highest level of government and in a publicly responsible official subject to the political process was accomplished by the specific language of § 2516(1) which had been suggested by the Justice Department in 1961 and which was included in the major subsequent legislative proposals. It was realized, however, as time went on that § 2516(1) dealt only with the *fact of authorization* of the application. As has been seen, subsequent proposals, bit by bit, added the requirement that *the person who actually authorized* the application *must be made known* to the judge to whom the application was submitted and to those others to whom the contents of his order would be disclosed (See § 2518(4) (d), § 2518(8) (d), and § 2519(1) (f)). Knowledge by the judge, by the persons to whom the contents of the order would ultimately be disclosed, and Congress and the public as a whole through the Reports of the Director of the Administrative Office of the United States Courts provided for in § 2519(3) were deemed to be necessary and appropriate to allow those concerned and interested the opportunity to fix the responsibility for the fact of the authorization of the application in a specific

and identifiable person who is subject to the political process.[8]

The statutory scheme therefore sets up a two-step process. First, the application for the wiretap must be authorized by the Attorney General or by an Assistant Attorney General specifically granted authority to act by the Attorney General. Second, the identity of the person who authorized the application must be made known to the judge acting on the application and ultimately, through his order, to any person who is a party to a proceeding in which the contents of any intercepted communication or evidence derived therefrom are offered in evidence or otherwise disclosed in court. These two requirements are equally important in the legislative scheme. If the only important fact were that one of the persons given the power to act by § 2516(1) had in fact authorized the application, it would not have been necessary to add the additional provisions of § 2518 to require the identity of the acting official to be set forth in the application and order.

If, by way of illustration, it is assumed that the Attorney General himself had authorized the application to be filed, it would obviously be a violation of the statute for the application and the order to state that not the Attorney General, but a specified Assistant Attorney General had authorized the application. The issuing judge, in the case of this illustration, and those persons who subsequently read his order would be misled and would place the responsibility for the authorization of the application upon the wrong person, that is, upon the specific Assistant Attorney General named in the application and the order rather than upon the Attorney General who had, in fact, authorized the application. It would not cure the difficulty in the factual framework of this illustration to

establish subsequent to the issuance of the wiretap order that the application had in fact been authorized by the Attorney General himself rather than by the Assistant Attorney General named in the application and order, since the statute requires that the identity of the authorizing official be made known to the issuing judge before the order is entered by him. Thus both tests must be met and one alone will not suffice.

Rule 41(c) of the Federal Rules of Criminal Procedure requires that a warrant "shall state the grounds or probable cause for its issuance and the names of the persons whose affidavits have been taken in support thereof." Although this requirement may be more of a constitutional one than the statutory two-prong test of §§ 2516(1) and 2518, the demand of Rule 41 for the affiant's name has been said to be based upon the similar premise that someone must take the *responsibility* for the facts alleged and that the defendant should be apprised of the name of that person. When an incorrect name has been furnished either by design or by mistake, the warrant has been declared invalid. King v. United States, 282 F.2d 398 (4th Cir. 1960); United States v. Carignan, 286 F.Supp. 284 (D. Mass.1967); but see United States v. Averell, 296 F.Supp. 1004, 1015 (E.D. N.Y.1969). Similarly the statutory scheme of Title III would be vitiated if the *wrong person* were named in the application for the wiretap and the order as the person who had in fact authorized the submission of the application.

In view of the two-prong test set up by § 2516(1) and by § 2518, this court believes that evidence would not be admissible to establish subsequent to the issuance of the order allowing the wiretap that authorization was in fact granted to make application for the wiretap where the issuing judge had no

---

8. While the words "subject to the political process" may not be synonymous with confirmation by the Senate, cf. United States v. Robinson, *supra*, 40 L. W. at 2455; United States v. Aquino, et al., Criminal 28578 (E.D.Mich.So.Div., Jan. 17, 1972), it at least means a per-son who is not subject to a merit system or Civil Service type appointment (see ABA Project on Minimum Standards for Criminal Justice, Standards Relating to Electronics Surveillance, pp. 131–133).

knowledge of, and his order did not refer to, such authorization. On the other hand, where the person who had in fact authorized the application is different from the person named in the application and the judge's order as having authorized the application, evidence establishing the true state of facts would be admissible subsequent to the issuance of the order for the purpose of impeaching or attacking the validity thereof.

 This proposition, while based on an interpretation of the mandate of the statute, is not unlike the rule applicable to search warrants. Title III, as has been previously noted, establishes procedures which are analogous to those used in the application for, and execution of, search warrants. See Berger v. New York, 388 U.S. 41, 53–64, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967); United States v. Cox, 449 F.2d 679, 683–87 (10th Cir. 1971). The sufficiency of an application to a magistrate for a search warrant is required to be measured by the application itself and the facts that are asserted under oath as a part of that application. The application may not be contradicted or expanded subsequent to the issuance of the warrant for the purpose of supplying information, or correcting information previously supplied, which is necessary to sustain the validity of the warrant. United States v. Melvin, 419 F.2d 136 (4th Cir. 1969); United States v. Roth, 319 F.2d 507 (7th Cir. 1967). Since responsibility is in the magistrate to determine whether or not there is sufficient information to provide probable cause for the issuance of a warrant, additional information provided subsequently, and which was not known to the magistrate at the time that he issued the warrant, cannot later be utilized to supply the requisite probable cause. On the other hand, the same premise that the

magistrate has the responsibility to determine probable cause may lead one to the conclusion that gross error in the information presented to the magistrate can later be shown to demonstrate that, in fact, there was not sufficient information upon which to base a finding of probable cause for the issuance of a warrant. King v. United States, *supra.*

Getting back to the specific facts of this case, the government argues that the Attorney General authorized the application for the wiretap on October 16, 1970, acting through his *alter ego*, Sol Lindenbaum, his Executive Assistant. This argument seems to be tailored to the suggestion of Circuit Judge Clark in United States v. Robinson, *supra,* at 40 L.W. 2455, that such a procedure would seem to have more merit than the procedures upon which the government relied in that case. Even so, the *Robinson* court stated strongly that the *personal* attention of the Attorney General was required in the exercise of his function either to designate specially an Assistant Attorney General to authorize the application or to authorize himself the application for the wiretap. The two other courts which have considered the question have reached the same conclusion as *Robinson.* United States v. Aquino, *supra;* United States v. Cihal, 336 F. Supp. 261 (W.D.Pa., 1972).

The government, while not relying upon the provisions of 28 U.S.C. § 510 [9] does argue that the legislative intent of § 2516(1) has been satisfied because Lindenbaum acted in the name of the Attorney General himself. In other words, the government's argument seems to be that while the Attorney General delegated authority to his personal assistant to authorize the application, he did not delegate the responsibility for the action. Accordingly, so that argument

---

9. Section 510 provides: "The Attorney General may from time to time make such provisions as he considers appropriate authorizing the performance by any other officer, employee, or agency of the Department of Justice of any function of the Attorney General." As

Circuit Judge Clark stated in *Robinson,* "The legislative history of § 2516(1) as well as simple logic, compels the conclusion that § 510 must not be read as liberalizing the narrow limits Congress placed on who could initiate the wiretap process." 40 L.W. at 2455.

would go, since the Attorney General has retained responsibility for the act of authorization, the legislative intent that there be "an identifiable person" upon whom the responsibility is fixed has been met.

It is no doubt true that in these days of proliferating governmental responsibilities, top-level officials must rely heavily upon intimate personal aides and, in some cases, act through them in order to be able physically to carry out their duties. It has been recognized that a personal aide and his employer in some circumstances can be treated as one. See United States v. Doe, 455 F.2d 753 (1st Cir., 1972). The question of whether or not the Attorney General can exercise his responsibility and authority under § 2516 (1) through his Executive Assistant is one which this court does not feel it is necessary to decide in this case.

Assuming that the Attorney General had properly authorized the application for the wiretap of the Giordano phone on October 16, 1970, the motions to suppress must be granted because both the application for the wiretap and the order of the issuing judge state that Will Wilson, an Assistant Attorney General specially designated for the purpose by the Attorney General, had been the one to authorize the submission of the application to the court. Paragraph Two of the affidavit and application of Francis B. Brocato, Assistant United States Attorney for the District of Maryland, states:

"Pursuant to the power conferred upon him by § 2516 of Title 18, United States Code, the Attorney General of the United States, the Honorable John N. Mitchell, has specially designated in this proceeding the Assistant Attorney General of the Criminal Division of the United States Department of Justice, the Honorable Will Wilson, to authorize affiant to make this application for an order authorizing the interception of wire communications. The letter of authorization signed by the

Assistant Attorney General is attached to this application as Exhibit A."

The letter, dated October 16, 1970, and purporting to bear the signature of Will Wilson, reads in pertinent part as follows:

"This is in regard to your request for authorization to make application pursuant to the provisions of § 2518 of Title 18, United States Code, for an order of the court authorizing the Federal Bureau of Narcotics and Dangerous Drugs to intercept wire communications . . . .

"I have reviewed your request and the facts and circumstances detailed therein and have determined that probable cause exists to believe that Nicholas Giordina and others as yet unknown have committed, are committing, or are about to commit offenses . . . . I have further determined that there exists probable cause to believe that the above person makes use of the described facility in connection with those offenses, that wire communications concerning the offenses will be intercepted, and that normal investigative techniques reasonably appear to be unlikely to succeed if tried.

"Accordingly, you are hereby authorized under the power specially delegated to me in this proceeding by the Attorney General of the United States, the Honorable John N. Mitchell, pursuant to the power conferred on him by § 2516 of Title 18, United States Code, to make application to a judge of competent jurisdiction for an order of the court pursuant to § 2518 of Title 18, United States Code, authorizing the Federal Bureau of Narcotics and Dangerous Drugs to intercept wire communications from the facility described above, for a period of 21 days."

This letter together with Mr. Brocato's affidavit can have only one reasonable meaning. Any fair reading of those two documents together would identify Will Wilson as the person who reviewed and

authorized on his own responsibility the submission of the application to the court and that he was an Assistant Attorney General who had been specially designated by the Attorney General to determine whether or not to authorize the application.

The order of the court, dated October 16, 1970, provided in part that the order was issuing

" . . . Pursuant to application authorized by the Assistant Attorney General for the Criminal Division of the United States Department of Justice, the Honorable Will Wilson, who has been specially designated in this proceeding by the Attorney General of the United States, the Honorable John N. Mitchell, to exercise the power conferred on him by § 2516 of Title 18, United States Code . . . ."

Again, the language of the order makes it crystal clear that the court was under the impression that Will Wilson on his own responsibility had authorized the application for the wiretap and that the Attorney General had specially designated Mr. Wilson as an Assistant Attorney General to determine whether or not the application should be authorized. The order in fact identifies Will Wilson as the person who authorized the application.

If the application and the order of court granting leave to institute the wiretap were allowed to stand, in spite of the fact that they did not correctly identify the person authorizing the application as required by the statute, one-half of the two-prong statutory scheme would be rendered a nullity. Such a gross error cannot be relegated to oblivion by terming it a "mere technicality" as the Assistant United States Attorney does in his understandable last-ditch effort to preserve his months of work on

this case. The statute imposes an overall ban on the interception and disclosure of wire or oral communications, but, under a system of strict judicial supervision, it authorizes interception under certain circumstances in connection with the investigation of particularized serious crimes by certain law enforcement officers. As was stated in United States v. Cox, *supra*, "If the officers have not complied with the strict requirements of the statute, the contents of the communication or evidence which stems from it can be suppressed . . . ." 449 F.2d at 684.

Section 2518(10) (a) (ii) provides that a motion to suppress may be granted if the order " . . . is insufficient on its face." If the order in this case had failed to identify the person who authorized the application, it would have been defective and insufficient on its face and certainly would have justified suppression of any evidence derived from the wiretap. In the view of this court, the misidentification of the person authorizing the application is no more a "technicality" than a failure to identify anyone, and similarly requires the granting of the motions to suppress.

The application and order relating to the extension of the wiretap are defective for the same reasons as the original application and order.

The motions to suppress the contents of any intercepted telephone communications under the orders in Misc. 739–N, dated October 16, 1970 and November 6, 1970, and the information obtained from the operation of the pen register under the orders in Misc. 737–N, dated October 22, 1970 and November 6, 1970, or any evidence derived therefrom, must be granted. An order has heretofore been entered in this cause granting the motions to suppress for the reasons expressed herein.